UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NAPLETON ORLANDO IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF ORLANDO, an Illinois limited liability company, NAPLETON SANFORD IMPORTS, LLC d/b/a NAPLETON'S VOLKSWAGEN OF SANFORD, an Illinois limited liability company, and NAPLETON AUTOMOTIVE OF URBANA, LLC d/b/a NAPLETON VOLKSWAGEN OF URBANA, a Florida limited liability company, on behalf of themselves and all others similarly situated, | No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| | **JURY TRIAL DEMANDED** |
| VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey Corporation, VW CREDIT, INC., a Delaware corporation, VOLKSWAGEN AG, a German corporation, ROBERT BOSCH, LLC, a Michigan limited liability company, and ROBERT BOSCH GmbH, a German corporation, | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................................................1

      A.    Volkswagen's "CleanDiesel" Fraud ...........................................................3

      B.    Volkswagen's Unfair Pricing and Allocation Schemes.............................7

II.   JURISDICTION .................................................................................................8

III.  VENUE ...............................................................................................................9

IV.   PARTIES .............................................................................................................9

      A.    Napleton Dealership Group ........................................................................9

      B.    Defendants ................................................................................................10

            1.    Volkswagen Group of America .....................................................10

            2.    Volkswagen AG.............................................................................10

            3.    Robert Bosch GmbH .....................................................................12

            4.    Robert Bosch LLC ........................................................................12

      B.    Non-Defendant Employees of Defendants Who Participated in the
            Alleged Criminal Conspiracy ...................................................................12

            1.    Martin Winterkorn ........................................................................12

            2.    Matthias Müller.............................................................................13

            3.    Michael Horn.................................................................................13

            4.    Volkmar Denner............................................................................14

V.    FACTUAL ALLEGATIONS CONCERNING THE DIESELGATE SCANDAL ...........14

      A.    EPA and State Regulations Place a Premium on the Reduction of
            Pollutants that Cause Smog and Are Harmful to Human Health...........14

      B.    Volkswagen's Plot to Dominate the Automotive Market.....................16

      C.    Defendants' Dirty "Cheat Device" Scheme.........................................21

      D.    Volkswagen Falsely Pitched Itself as a Leader in Environmental Issues.............27

E.      Volkswagen Falsely Marketed its Diesel Engine Systems as Clean and Green ...................................................................................................28

F.      Volkswagen's CleanDiesel Engine Systems Were a Fraud .................................36

G.      Once Caught, Volkswagen Admitted its Fraud—in Part, but Simultaneously Sought to Cover Up the Scope of Its Deceit ..............................38

H.      Volkswagen Profited From its Dieselgate Fraud ................................................52

I.      Volkswagen's False Advertising and Fraud Has Profoundly Harmed Franchise Dealers ................................................................................................53

J.      Volkswagen's Refusal to Take Any Prompt Action to Remedy its Fraudulent Scheme Continues to Profoundly Harm Consumers, Franchise Dealers and the Environment ...............................................................56

K.      Things at Volkswagen Will Not Get Better Anytime Soon ..................................59

L.      Volkswagen's Illegal Scheme Has Triggered Global Scrutiny ...........................61

VI.     FACTUAL ALLEGATIONS CONCERNING PLAINTIFFS ...........................................63

A.      Acquisition of Plaintiffs' Volkswagen Dealerships ............................................63

B.      Volkswagen's Tier Pricing and Manipulation of DSI Sales Metric ....................67

C.      Volkswagen's Tier Pricing and Coercion to Force Franchise Dealers to Floor Plan Finance with VCI ...............................................................................69

VII.    TOLLING OF THE STATUTE OF LIMITATIONS ......................................................73

A.      Discovery Rule Tolling .......................................................................................73

B.      Fraudulent Concealment Tolling .........................................................................74

C.      Estoppel .............................................................................................................74

VIII.   CLASS ALLEGATIONS ...........................................................................................75

IX.     VIOLATIONS ALLEGED .........................................................................................79

A.      Claims Brought on Behalf of the Franchise Dealer Class ...................................79

COUNT I VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT 15 U.S.C. § 1221, ET SEQ. (BROUGHT AGAINST VOLKSWAGEN GROUP OF AMERICA) ..............................................................................................79

COUNT II VIOLATIONS OF RACKETEER INFLUENCED AND  CORRUPT
    ORGANIZATIONS ACT (RICO) VIOLATION OF 18 U.S.C. § 1962(C) - (D)............83

      1.     The Members of the Emissions Fraud Enterprise.....................................84

          a.     Volkswagen Defendants ................................................................84

          b.     The Volkswagen Defendants' Executives, Officers and
               Engineers......................................................................................86

          c.     Bosch Defendants .........................................................................89

      2.     Emissions Fraud Enterprise Allegations....................................................91

      3.     The Predicate Acts .....................................................................................94

   B.     Claims Brought on Behalf of the Florida Subclass..............................................97

COUNT III VIOLATIONS OF SECTION 320.64(4), FLORIDA STATUTES
    (AGAINST VGOA)...........................................................................................97

COUNT IV BREACH OF CONTRACT  (BASED ON FLORIDA LAW)...............................101

COUNT V FRAUDULENT CONCEALMENT  (BASED ON FLORIDA LAW)...................102

   C.     Claims Brought on Behalf of the Illinois Subclass.............................................104

COUNT VI VIOLATION OF ILLINOIS MOTOR VEHICLE FRANCHISE ACT 815
    ILCS 710/1, ET SEQ. ....................................................................................104

COUNT VII FRAUD BY CONCEALMENT (BASED ON ILLINOIS LAW) ........................106

COUNT VIII BREACH OF CONTRACT  (BASED ON ILLINOIS LAW) ............................109

REQUEST FOR RELIEF ......................................................................................110

DEMAND FOR JURY TRIAL ...............................................................................111

010549-11  865477 V1

Plaintiffs Napleton Orlando Imports, LLC d/b/a Napleton's Volkswagen Of Orlando, an Illinois limited liability company, Napleton Sanford Imports, LLC d/b/a Napleton's Volkswagen of Sanford, an Illinois limited liability company and Napleton Automotive of Urbana, LLC d/b/a Napleton Volkswagen of Urbana, a Florida limited liability company (individually "Napleton VW Orlando", "Napleton VW Sanford", "Napleton VW Urbana" and collectively referred to as "Plaintiffs"), individually and on behalf of all others similarly situated (the "Franchise Dealer Class"), allege the following:

## I.     INTRODUCTION

1.     A car maker cannot use its immense power in the marketplace to subjugate and take advantage of much smaller franchise dealers.  In all their dealings, car makers must be honest, forthright, and transparent, and they cannot discriminate against some dealers in favor of others, or force dealers to use their own affiliates for related business.  This suit arises because Volkswagen Group of America, and its German parent, Volkswagen AG, have ignored these basic rules.

2.     Reflective of car makers' long history using their overwhelming market power to the disadvantage of small car dealers, the US and the individual states have passed laws and regulations designed to prevent such abuses of power. But these laws stood no chance against Volkswagen's culture of growth and profit at any cost.  With remarkable hubris and little care for its dealers, customers, and our planet as a whole, Volkswagen flouted these laws.  As a stark example, two weeks *after* VW admitted to regulators that it had installed illegal defeat devices in hundreds of thousands of US cars, and three days *before* those admissions were made public, VW pushed through Ed Napleton's purchase of a Volkswagen franchise in Urbana, Illinois, at top dollar, as if the Dieselgate scandal was not about to toss the Volkswagen brand value of a proverbial cliff.

3.      But Volkswagen's abuse of its smaller dealers did not stop with its fraud in ushering dealership transactions and investments at inflated values, it also abused dealers through creation of unlevel allocation and pricing, and coerced dealers into using Volkswagen's affiliated loan company, VCI.

4.      The Napleton Family has been involved in the automobile dealership business in the Chicago area for three generations.  Edward W. Napleton opened his first dealership in 1931 on Chicago's South Side.  Along with his son, Francis Napleton, they grew from a single Buick service station to several franchises in and around Chicago.  Five of Francis' Napleton's eight children have worked their entire lives in the automobile industry.  Edward F. (Ed) Napleton began his career sweeping floors at a dealership owned by his father, Francis, and grandfather, Edward.  He worked up the ranks, serving as a technician, in sales, and in finance, eventually becoming a general manager.  At 23, Ed Napleton became the youngest car dealer in the United States when he was awarded a Pontiac dealership in Blue Island, Illinois.

5.      Today the Napleton family operates more than 50 dealerships in five states.  Ed's business has grown to include 56 franchises in 30 different locations in five states.  His business employs over 1,800 people in Illinois, Georgia, Florida, Pennsylvania, and Missouri.

6.      Ed Napleton believes that with his sizable presence in the marketplace comes a responsibility to stand up for dealerships large and small.  Individual dealers and small dealer groups are often at the mercy of the immense vehicle manufacturers with respect to critical pricing terms and vehicle allocations.  These smaller firms are often unwilling for fear of reprisal, or unable financially, to hold vehicle manufacturers to the legally required standards of fair play and non-discrimination.  Moreover, when foul play is detected, these smaller firms can

- 2 -

be placed under extreme duress to play along, or risk retaliation from the automaker that could end their very existence in the market place.

7.     On September 15, 2015, Ed purchased his third VW dealership in Urbana, Illinois.  He did so based on VW's history, its status as one of the world's largest car manufacturers, and its promise of continuing success of its flagship clean diesel cars.  Just three days later, the EPA publicized VW's admission that it had employed a "defect device" on over 11 million vehicles worldwide.  This revelation stunned the world and has had severe repercussions for Plaintiffs and all VW franchise dealers in the United States.

8.     Volkswagen AG and Volkswagen Group of America, Inc. (collectively, "Volkswagen" or "VW") have defrauded VW franchise dealers, federal and state regulators, and consumers with respect to the emissions levels of so-called "CleanDiesel" vehicles; and because Volkswagen and Volkswagen Credit, Inc., have engaged in systematic unfair and illegal pricing practices with respect to vehicle pricing and allocation schemes.

9.     As a direct and foreseeable result of VW's unlawful emissions fraud, illegal pricing and allocation schemes, and coercion to use Volkswagen Credit, VW dealers have been harmed in their business in the form of reduced sales, lost profits, cars sitting on their lots which cannot be sold, and investments in dealerships that are worth substantially less than their purchase, investment, and carrying costs.

**A.     Volkswagen's "CleanDiesel" Fraud**

10.     Volkswagen's monumental fraud in the certification of its so-called "CleanDiesel" automobiles in the U.S. and worldwide through the use of illegal "defeat devices" was certainly the most significant event in the automotive industry in the last decade, and one of the most significant environmental crimes in history.  As stated by Cynthia Giles, Assistant Administrator for the Office of Enforcement and Compliance Assurance at the EPA:  "Using a

- 3 -

defeat device in cars to evade clean air standards is illegal and a threat to public health." Yet that is exactly what Volkswagen did in its 2009-2015 Volkswagen, Audi, and Porsche CleanDiesel vehicles.[1] And the defeat device at issue was supplied to Volkswagen by Defendant Robert Bosch GmbH ("Bosch"). Everything about Volkswagen's fraudulent scheme was coolly calculated, as defendant Michael Horn, the newly departed CEO of VW America, confessed in the fall of 2015 at Congressional hearings: "[the defeat device] was installed for this purpose, yes."[2]

11.     The United States Government, through the Environmental Protection Agency, as well as individual state regulators, have passed and enforced laws designed to protect citizens from pollution and in particular, certain chemicals and agents known to cause disease in humans. Automobile manufacturers must abide by these laws and must adhere to state and EPA rules and regulations. Following revelations of Volkswagen's widespread use of defeat devices to defraud the EPA and state regulators, hundreds of class action lawsuits were filed on behalf of consumers who purchased the affected vehicles, and independent dealers who owned the affected vehicles, but were unable to sell them because of Volkswagen's fraud. This case arises because the Volkswagen emissions fraud has also caused great harm to franchise dealers like Plaintiffs whose profits have been erased and whose dealerships have plummeted in value due to the inability to sell tens of thousands of affected vehicles and the significant decline in brand value for all Volkswagen vehicles as a result of Volkswagen's purposeful fraud and deceit.

12.     Volkswagen promised low-emission environmentally friendly vehicles, with high fuel economy and exceptional performance. In response to Volkswagen's aggressive advertising

---

[1] *See* Sept. 18, 2015 EPA News Release; Nov. 2, 2015 EPA News Release.

[2] *See* Bill Chappell, *'It Was Installed For This Purpose,' VW's U.S. CEO Tells Congress About Defeat Device*, NPR (Oct. 8, 2015), available at http://www.npr.org/sections/thetwo-way/2015/10/08/446861855/volkswagen-us-ceo-faces-questions-on-capitol-hill.

of "Clean" diesel, consumers bought them in record numbers. Volkswagen has sold more diesel cars in the United States than every other brand combined. From 2009 to 2015, Volkswagen sold and/or leased in the United States nearly 580,000 dirty diesels that its defeat device disguised as clean (the "Affected Vehicles").

13.     Affected Vehicles include the following:

| 2.0 Liter Diesel Models and Years | |
| --- | --- |
| Volkswagen Jetta | 2009-2015 |
| Volkswagen Jetta SportWagen | 2009-2014 |
| Volkswagen Beetle | 2012-2015 |
| Volkswagen Beetle Convertible | 2012-2015 |
| Audi A3 | 2010-2015 |
| Volkswagen Golf | 2010-2015 |
| Volkswagen Golf SportWagen | 2015 |
| Volkswagen Passat | 2012-2015 |

| 3.0 Liter Diesel Models and Years | |
| --- | --- |
| Volkswagen Touareg | 2009-2016 |
| Porsche Cayenne | 2013-2016 |
| Audi A6 Quattro | 2014-2016 |
| Audi A7 Quattro | 2014-2016 |
| Audi A8 | 2014-2016 |
| Audi A8L | 2014-2016 |
| Audi Q5 | 2014-2016 |
| Audi Q7 | 2009-2016 |

14.     Volkswagen's apparent success in creating the niche CleanDiesel market and exploiting it led to a brand resurgence that significantly enhanced the value of the brand and, therefore, the value of—and cost to purchase—franchise dealerships. Now however, "there are half a million cars running an emissions setup that never should've left the factory."[3] Each of these Affected Vehicles is illegal and never should have been sold because Volkswagen's fraudulently obtained EPA certificates of conformity were invalid. Since the confirmation of

---

[3] http://www.popularmechanics.com/cars/a17430/ezra-dyer-volkswagen-diesel-controversy/ (last visited on Sept. 28, 2015).

Volkswagen's scheme, the U.S. DOJ and at least 45 state attorneys general have announced they are investigating Volkswagen's misconduct. The FTC has separately sued Volkswagen for fraudulent advertising; and other criminal and civil investigations are underway across the globe.

15.     As detailed in the EPA's Notice of Violation ("NOV"), sophisticated software in the Affected Vehicles sold by Volkswagen and its affiliates in the United States detects when the vehicle is undergoing emissions testing and engages full emissions controls during the test.  But otherwise, at all other times that the vehicle is running, the emissions controls are suppressed. Thus, the Affected Vehicles meet emissions standards in the laboratory or testing station, but during normal operation emit nitrogen oxides (NOx) at up to 40 times the standard allowed under federal and state laws and regulations.  The software constituting the defeat device was produced by Defendants Robert Bosch GmbH and Robert Bosch LLC (the "Bosch Defendants") and contained in an Electronic Diesel Control Module ("EDC") that the Bosch Defendants provided to Volkswagen.  It is a defeat device as defined by the Clean Air Act.

16.     By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than what was certified to the EPA, and higher levels than state and federal regulations allow, Volkswagen violated the Clean Air Act and state environmental regulations, breached state franchisee protection laws, breached its franchise dealer agreements, defrauded its franchise dealers, and engaged in unfair competition under state and federal law.

17.     Substantial diminution in the value of Affected Vehicles has already been reported. On average, the resale value of Volkswagen diesel cars fell 13% in the first two weeks following the disclosure of the VW fraud.[4]  And in the months since then, with a broad no-sale order and no viable fix on the horizon, values have plummeted even more.  In addition, former

---

[4] *See* http://www.buzzfeed.com/matthewzeitlin/resale-value-of-vw-diesels-down-13-percent#.kvRJEo96L

Volkswagen Group of America CEO Michael Horn admitted in Congressional testimony on October 8, 2015, that at least 415,000 of the Affected Vehicles will require software *and hardware* changes and any fix for these vehicles could take years to implement and vehicle performance may be implicated.[5] The precipitous drop in the value of Affected Vehicles, the inability of franchise dealers to sell Affected Vehicles, and the tremendous diminution in the Volkswagen brand value has caused direct and quantifiable harm to Plaintiffs and the Franchise Dealer Class.

18.     What makes Volkswagen's fraud on their franchise dealers particularly egregious is that Volkswagen knew from at least early 2014 that its fraud was unraveling, yet it kept dealers in the dark until the very day of the NOV. Plaintiff Napleton Automotive of Urbana was purchased just three days before the September 18, 2015 NOV, yet Volkswagen withheld the truth and pushed the sale through, even though it knew Plaintiff was purchasing a dealership that would imminently plummet in value. Moreover, even after it was caught, Volkswagen continues to attempt to conceal the breadth of the fraud and who knew what when. In a lawsuit filed March 8, 2016, a Volkswagen Information Manager at its Auburn Hills, Michigan, facility alleges a deliberate effort to destroy electronic evidence relevant to the Dieselgate scandal.[6]

**B.     Volkswagen's Unfair Pricing and Allocation Schemes**

19.     Volkswagen has engaged in policies with respect to its franchise dealers that are in direct conflict with federal law designed to protect car dealers from unfair practices by vehicle manufacturers, as well as various franchisee protection laws of several states, causing direct and measurable harm to Plaintiffs. In addition to the their claims on behalf of all Volkswagen

---

[5] *See* http://www.autonews.com/article/20151008/OEM02/151009826/older-vw-diesels-will-need-software-and-hardware-fixes-horn-tells.

[6] *See Donovan v. Volkswagen Group of America*, Case No. 2016-151877-CD (Oakland County Court, March 8, 2016).

franchise dealers nationwide, Plaintiffs, on behalf of the Volkswagen franchise dealers located in Florida and Illinois, seek damages and injunctive relief under applicable state franchise protection laws.

## II.    JURISDICTION

20.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because Plaintiffs' claims arise under the RICO Act, 18 U.S.C. § 1962.  The Court also has diversity jurisdiction because Plaintiffs and Defendants reside in different states.  The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.  This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Franchise Dealer Class Action Fairness Act of 2005, because Plaintiffs and Volkswagen are citizens of different states; there are more than 100 members of the Franchise Dealer Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States.  The citizenship of each party is described further below in the "Parties" Section.

21.    This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d), and/or Cal. Code Civ. P. § 410.10.  This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district and this State, and intentionally availed themselves of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Volkswagen vehicles in this State and District.  At least in part because of Defendants' misconduct as alleged in this lawsuit, Affected Vehicles ended up on this state's roads and dozens of franchise dealerships.

### III. VENUE

22.     Venue is proper in this Court under 28 U.S.C. § 1391, because: (i) Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Defendants' promotion, marketing, distribution and sale of the Affected Vehicles to Plaintiffs and other Franchise Dealer Class members in this District.  Defendants sell a substantial amount of automobiles in this District, have dealerships located throughout this District, and the misconduct occurred in part in this District. Venue is also proper under 18 U.S.C. § 1965(a), because Defendants are subject to personal jurisdiction in this District as alleged in the preceding paragraph, and Defendants have agents located in this District.

### IV. PARTIES

**A.     Napleton Dealership Group**

23.     Plaintiffs NAPLETON VW ORLANDO and NAPLETON VW SANFORD are limited liability companies existing under the laws of the State of Illinois and are authorized to do business in the State of Florida.  NAPLETON VW URBANA is an Illinois limited liability company authorized to do and doing business in the State of Illinois.

24.     Plaintiffs, NAPLETON VW ORLANDO and NAPLETON VW SANFORD are "motor vehicle dealers" as defined in section 320.60(11)(a), Florida Statutes. Plaintiffs' primary places of business are 12700 E. Colonial Drive, Orlando, FL 32826 and 4175 S. Orlando Drive, Sanford, FL 32773.

25.     Plaintiff, NAPLETON VW URBANA is a "motor vehicle dealer" as defined in 815 ILCS 710/4, *et seq*. whose primary place of business is 1111 O'Brien Drive, Urbana, IL 61802.

**B.      Defendants**

**1.      Volkswagen Group of America**

26.      Volkswagen Group of America, Inc. ("VGoA") is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.  VGoA is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states.  In 2014 alone, VGoA sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI® "clean" diesel vehicles.

27.      VGoA is a licensed "distributor" as defined in sections 320.60(5) and (9), Florida Statutes and 815 ILCS 710/2(g), Illinois Statutes.  VGoA is a "licensee" as defined in section 320.60(8), Florida Statutes and a "franchiser" as defined in 815 ILCS 710/2(i) Illinois Statutes.

**2.      Volkswagen AG**

28.      Volkswagen AG ("VWAG") is a German corporation with its principal place of business in Wolfsburg, Germany.  VWAG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles.  VWAG is the parent corporation of VGoA, Audi AG, and Porsche AG.  According to VWAG, it sold 10.14 million cars worldwide in 2014—including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars.  Combined with other brands, VWAG boasts a 12.9% share of the worldwide passenger car market.  VWAG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion).  At €12.7 billion (approximately $13.9 billion), VWAG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

29.     VWAG engineered, designed, developed, manufactured, and installed the defeat device software on the Affected Vehicles equipped with the 2.0-liter TDI® and exported these vehicles with the knowledge and understanding that they would be sold throughout the United States.  VWAG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell the Affected Vehicles.

30.     VWAG is a manufacturer as defined in section 320.60(9), Florida Statutes and 815 ILCS 710/2(b), Illinois Statutes.

31.     VGoA and VWAG were and are at all times relevant to the allegations in this complaint working in concert under the common objective to engage in the emissions scheme described in this complaint.  Each of VGoA and VWAG were and are the agents of each other and have acted and act for their common goals and profit.  Therefore, all acts and knowledge ascribed to one of VGoA or VWAG are properly imputed to the other.  VGoA and VWAG are referred to collectively herein as Volkswagen or "VW."

32.     At all times relevant to this action, Volkswagen manufactured, distributed, sold, leased, and warranted the Affected Vehicles under the Volkswagen, Audi, and Porsche brand names throughout the United States.  Volkswagen and/or its parents, affiliates and agents designed, manufactured, and installed the CleanDiesel engine systems in the Affected Vehicles, which included the "defeat device," manufactured by Bosch Defendants. Volkswagen and/or its parents, affiliates, and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Affected Vehicles.

33.     Defendant Volkswagen Credit, Inc. ("VCI") is a corporate entity organized and existing under the laws of the State of Delaware. VCI is a "Sales finance company" as defined in Florida Statutes, section 520.31 and a motor vehicle financing affiliate as defined in 815 ILCS

- 11 -

710/3.1, and is an affiliate of VGoA and engaged in the business of purchasing retail installment contracts from one or more retail sellers throughout the United States.

**3.    Robert Bosch GmbH**

34.    Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH is the parent company of Robert Bosch LLC.  Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Affected Vehicles.

**4.    Robert Bosch LLC**

35.    Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan 48331.  Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch Gmbh.  Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to Volkswagen for use in the Affected Vehicles.

**B.    Non-Defendant Employees of Defendants Who Participated in the Alleged Criminal Conspiracy**

**1.    Martin Winterkorn**

36.    Martin Winterkorn is a resident of Germany.  Winterkorn was CEO of VWAG until he resigned on September 23, 2015, in the wake of the diesel emissions scandal.  Notably, Winterkorn was widely regarded as a detail-oriented, micromanaging CEO, who retained control over engineering details that many other CEOs would relinquish fully to deputies.  Winterkorn is being investigated by the German government for allegations of fraud.  Winterkorn reportedly hand-picked the engineers who designed the defeat devices.  Winterkorn received compensation

from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles, and Volkswagen's increased market share. Winterkorn approved, authorized, directed, ratified, and/or participated in the acts complained of herein.

### 2. Matthias Müller

37. Matthias Müller is a resident of Germany. Müller is a 40-year veteran of Volkswagen, where he began as an apprentice toolmaker at Audi AG in 1977. Müller was appointed coordinator of the Audi model lines in 2002, after Winterkorn took over the management of Audi AG. In 2007, when Winterkorn became CEO of VWAG, Winterkorn appointed Müller as Head of Product Management across all Volkswagen brands. In 2010, Müller was appointed CEO of Porsche AG. In 2014, Müller became the Chief Information Officer of Porsche Automobil Holding SE. Müller became the CEO of VWAG on September 25, 2015, upon Winterkorn's resignation amidst the emissions scandal. Müller profited millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles and Volkswagen's increased market share. Müller approved, authorized, directed, ratified, and/or participated in the acts complained of herein.

### 3. Michael Horn

38. Michael Horn is a resident of Virginia. Until last month, Horn was President and CEO of VW America. Horn received compensation from the illegal scheme and course of conduct based on the revenues and profits from the Affected Vehicles, and Volkswagen's increased market share. Horn approved, authorized, directed, ratified, and/or participated in the acts complained of herein. Horn has admitted that he was aware of the vehicles' emissions non-compliance since at least 2014.

### 4.     Volkmar Denner

39.     Volkmar Denner is a resident of Germany.  Denner has been the Chairman CEO of Robert Bosch GmbH since July 1, 2012.  Denner contemporaneously holds the position of Chief Technology Officer.  Denner joined Bosch in 1986, and has held numerous positions within the company, including, Director of ECU Development, Vice-President of Sales and Development, Semiconductors and Electronic Control Units division, and President of Automotive Electronics division.  In 2006, Denner became a member of Robert Bosch GmbH's Board of Management and was later responsible for research and advance engineering, product planning, and technology coordination across the company's three business sectors from July 2010 until his appointment as CEO.  Denner received millions of dollars from the illegal scheme and course of conduct based on the revenues and profits from the sale of defeat devices to Volkswagen.  Denner approved, authorized, directed, ratified, and/or participated in the acts complained of herein.

## V.     FACTUAL ALLEGATIONS CONCERNING THE DIESELGATE SCANDAL

### A.     EPA and State Regulations Place a Premium on the Reduction of Pollutants that Cause Smog and Are Harmful to Human Health

40.     The Clean Air Act, enacted in 1970, is a comprehensive federal law that regulates air emissions from stationary and mobile sources. 42 U.S.C. § 7401, *et seq*. (1970).  Congress determined that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare."  CAA § 101(a)(2), 42 U.S.C. § 7401(a)(2).  The Clean Air Act and the regulations under it, as well as state regulations, were passed and are intended to reduce the emission of NOx and other pollutants, thereby protecting human health and the environment.

41.     NOx contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter.  When humans are exposed to nitrogen dioxide, they may be at a greater risk for serious

010549-11  865477 V1

health dangers, including asthma attacks and other respiratory illness requiring hospitalization. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at an elevated risk for adverse health consequences associated with these pollutants.

42. The Clean Air Act requires car makers to certify that vehicles sold in the United States meet federal emissions standards. The EPA certifies conformity with regulations to car makers for vehicles that satisfy emissions regulations. To be sold in the United States, a vehicle must be certified by the EPA to comply with its regulations.

43. The Clean Air Act makes it a violation for "any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."

44. The Clean Air Act defines a "defeat device" as one "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation use." When a defeat device is in place, it can bypass, defeat, or render inoperative elements of the vehicle's emission control system that are put in

- 15 -

place to ensure compliance with the Clean Air Act. Motor vehicles that are equipped with defeat devices cannot be certified by the EPA and are therefore illegal to sell in the United States.[7]

45.     California's emission standards are even more stringent than the EPA standards. Several states have adopted California's standards and also demand even more from car makers than the EPA. The California emissions regulator is called the California Air Resources Board, or CARB.

**B.     Volkswagen's Plot to Dominate the Automotive Market**

46.     Volkswagen's illegal diesel emissions scheme was borne out of greed and ambition to dominate the global automotive market at any cost. By Volkswagen's own admissions, the seeds for the scandal were planted in 2005, as Volkswagen was repositioning its fleet of vehicle offerings in light of tightening U.S. emission regulations, "with a strategic decision to launch a large-scale promotion of diesel vehicles in the United States in 2005."[8] While other automakers focused on hybrid, electric or hydrogen fueled vehicles, Volkswagen pivoted toward "clean diesel" technology as its primary strategy to reach the growing target market of environmentally conscious consumers.

47.     In 2004, the second generation Toyota Prius became an explosive success, tripling global sales from years prior and changing environmentally-friendly vehicles from a niche market to a standard consumer option. Although it was the first mainstream hybrid vehicle, the Prius was widely viewed as "boring," because the improvements in fuel efficiency and emissions were offset by relatively bland styling and lackluster driving performance.

---

[7] EPA, Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device (Dec. 11, 1972).

[8] *Volkswagen making good progress with its investigation, technical solutions, and Group realignment*, VOLKSWAGEN AG (Dec. 10, 2015), http://www.volkswagenag.com/content/ vwcorp/info_center/en/news/2015/12/VW_PK.html.

48.     Volkswagen took note of the success of the Prius and sought to achieve the same (or better) efficiency benchmarks, but in a "fun-to-drive," high-performance vehicle. This was to be achieved with a purported remarkable breakthrough in diesel technology: the EA189 TDI engine. TDI, short for "turbocharged diesel injection," was the culmination of millions of dollars in research and development, and was heralded by VW as the critical factor that would be responsible for its growth and success in the U.S.

49.     In 2007, Martin Winterkorn left his position at Audi to become VWAG's CEO. Winterkorn set goals for Volkswagen to become a world leader in automobile manufacturing. This included a target of tripling U.S. sales to at least 800,000 vehicles by 2018.[9] At the time, diesel-engine vehicles made up just 5% of the U.S. car market, and Winterkorn recognized this as the perfect opportunity to expand Volkswagen's market share.

50.     To expand its diesel market penetration in the U.S., Volkswagen needed to overcome the stigmas associated with diesel vehicles. Foremost among these was the consumer perception that diesel engines emitted thick, toxic smoke full of dangerous and destructive pollutants, and should be relegated to the smog-filled cities of the past. In developing and marketing a new kind of diesel vehicle, Volkswagen claimed to have solved the environmental problems with its new EA189 engine, which it aggressively marketed as the clean, green, sporty alternative to hybrid engines, such as those in the Prius.

51.     Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints. To get the job done, Winterkorn appointed two engineers with whom he

---

[9] William Boston, *Volkswagen Emissions Investigation Zeroes In on Two Engineers*, WALL STREET JOURNAL (Oct. 5, 2015), http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602.

had worked closely at Audi (Ulrich Hackenberg and Wolfgang Hatz) to lead up R&D and engine development for this project. These two engineers were the chief developers of the TDI engine.[10] Their primary mandate from management was to develop a diesel engine that maintained the performance of traditional gasoline engines with reduced $CO_2$ emissions and lower gas mileage, all while meeting the strict $NO_X$ emission standards in the U.S.

52. Diesel fuel is traditionally denser than gasoline, and the syrupy fuel contains longer hydrocarbon chains, which tend to produce a more efficient vehicle. In fact, diesel engines can convert over 45% of fuel energy into useful mechanical energy, whereas gasoline engines convert only 30% of fuel into energy.[11] To make use of this dense diesel fuel, diesel engines combine high temperatures and high compression to produce a pressure-cooker of mechanical energy, as opposed to a spark ignition in the typical gasoline engine. Though more efficient, diesel engines come with their own set of challenges, as highly-compressed diesel emissions produce high levels of $NO_X$. These $NO_X$ emissions can be reduced by adjusting the compression and temperature, but that in turn produces soot, a similarly-undesirable hydrocarbon emission. Diesel engines exist in a state of balance between these conditions, known as "rich" and "lean" states. A diesel engine in a rich state contains more fuel than air, which in turn tends to burn off less fuel and thereby produces higher amounts of soot, reduced fuel efficiency, and sluggish driving performance. On the other hand, the lean state contains more air than fuel and produces higher amounts of $NO_X$. Neither of these discharges is desirable, and for the EPA to designate a diesel car as a "clean" vehicle, it must produce **both** low soot and low $NO_X$.

---

[10] Jack Ewing, *Volkswagen Engine-Rigging Scheme Said to Have Begun in 2008*, N.Y. TIMES (Oct. 5, 2015), http://www.nytimes.com/2015/10/05/business/engine-shortfall-pushed-volkswagen-to-evade-emissions-testing.html.

[11] *Just the Basics, Diesel Engine*, U.S. DEPT. OF ENERGY, OFFICE OF ENERGY EFFICIENCY & RENEWABLE ENERGY (last visited Feb. 8, 2016), *available at* http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf.

53.     In recent years, the EPA and the California Air Resources Board ("CARB") have promulgated stricter $NO_X$ emission standards, requiring all diesel models starting in 2007 to produce 90% less $NO_X$ than years prior.[12]  These strict emission standards posed a challenge to Volkswagen's engineers in developing the EA189 engines.  In fact, during a 2007 demonstration in San Francisco, engine R&D chief Hatz lamented presciently that "[Volkswagen] can do quite a bit and we will do a bit, but 'impossible' we cannot do. . . . From my point of view, the CARB is not realistic . . . I see it as nearly impossible for [Volkswagen]."[13]

54.     Yet, the "impossible" is just what Volkswagen set out to do.  In order to successfully grow the U.S. diesel market and meet its ambitious goals, Volkswagen needed to develop the technology to reduce $NO_X$ emissions, while maintaining the efficient, powerful performance of a lean-state diesel engine.  This seemingly impossible dilemma mired Volkswagen in an internal struggle about how to best proceed, with two divergent technological solutions available: selective catalytic reduction ("SCR"), or use of a lean $NO_X$ trap ("LNT").

55.     Advocating the former of these solutions, in 2006, Wolfgang Bernhard, then a top executive at VWAG (and former Daimler executive), championed a technology-sharing agreement with Mercedes-Benz and BMW to jointly develop a SCR system using urea.  This system, which assists in neutralizing emissions of $NO_X$, was generically known as a "Diesel Exhaust Fluid" system and marketed as "Bluetec" by Mercedes and "AdBlue" by Volkswagen and other German vehicle manufacturers.  This solution, touted by Bernhard, worked by

---

[12] *Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*, ENVIRONMENTAL PROTECTION AGENCY (Dec. 2000), http://www3.epa.gov/ otaq/highway-diesel/regs/f00057.pdf.

[13] Danny Hakim, *et al.*, *VW Executive Had a Pivotal Role as Car Maker Struggled With Emissions*, N.Y. TIMES (Dec. 21, 2015), http://www.nytimes.com/2015/12/22/business/ international/vw-executive-had-a-pivotal-role-as-car-maker-struggled-with-emissions.html?mt rref=undefined&gwh=7E46E42F7CCC3D687AEC40DFB2CFA8BA&gwt=pay.

injecting urea into a diesel vehicle's exhaust stream to react with the $NO_X$, converting it into harmless nitrogen and oxygen.

56.     While Hatz initially supported this solution, stating publicly at the Detroit Auto Show in early 2007 that "Bluetec technology allows us to demonstrate Audi's commitment to always being at the very forefront of diesel technology,"[14] his support dissipated as Volkswagen's leadership factionalized—split between those who balked at the $350 per-vehicle cost of the SCR system advocated by Bernhard, and those who thought that the SCR system was the only technologically feasible method to meet emission regulations.

57.     Bernhard, the advocate for SCR, ultimately lost the internal battle at Volkswagen and resigned.  Consequently, Hatz remained and was tasked with implementing the alternative strategy: the lower-cost LNT.  This relatively inexpensive technology involved the storage of $NO_X$ emissions in a separate compartment during vehicle operation.  Once that compartment filled up, the system burned off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passed through to the converter, where it then burned the $NO_X$ into nitrogen and oxygen.  While this method was cheaper and easier to implement than the SCR system advocated by Bernhard, it was less effective and resulted in lower fuel efficiency.

58.     According to many sources (including journalists, industry insiders, and Volkswagen whistleblowers), Volkswagen's top brass issued a directive to its engineers to find a way to meet emission standards despite tight budgetary and technical constraints, or suffer the consequences.  Volkswagen AG's former CEO, Ferdinand Piëch, created "a culture where performance was driven by fear and intimidation" and whose leadership was characterized as "a

---

[14] *Id.*

reign of terror."[15]  Employees were told, "[y]ou will sell diesels in the U.S., and you will not fail.

Do it, or I'll find somebody who will."[16]  Piëch was infamous for firing subordinates who failed

to meet his exacting standards:  "Stories are legion in the industry about Volkswagen engineers

and executives shaking in their boots prior to presentations before Piech, knowing that if he was

displeased, they might be fired instantly."[17]  And so it seems, out of self-preservation, the cheat

device scandal was borne.

## C.    Defendants' Dirty "Cheat Device" Scheme

59.    Volkswagen engineers had to find a solution to the "impossible" problem of

passing stricter emission standards while maintaining performance and fuel efficiency, all while

hamstrung by cost-cutting measures.  And it had to be done fast, because the new diesel vehicles

were scheduled for imminent release in the U.S.

60.    Ultimately, time ran out, and Volkswagen executives and engineers were either

unable or unwilling to devise a solution within the constraints of the law and their self-imposed

cost-cutting measures.  So instead of being honest (and risk being summarily fired), they and

others conspired to cheat by installing a "defeat device" in the new diesel vehicles so that those

vehicles could "pass" the EPA and CARB emission testing, and Volkswagen could obtain COCs

and EOs to sell the vehicles to make its sales targets throughout the U.S and in California.

61.    It became clear that the TDI engine could not meet U.S. emission regulations

when the launch of the Jetta TDI "clean" diesel, initially scheduled for 2007, had to be delayed

---

[15] Bob Lutz, *One Man Established the Culture That Led to VW's Emissions Scandal*, ROAD & TRACK (Nov. 4, 2015), http://www.roadandtrack.com/car-culture/a27197/bob-lutz-vw-diesel-fiasco/.

[16] *Id.*

[17] Doron Levin, *The man who created VW's toxic culture still looms large*, FORTUNE (Oct. 16, 2015), http://fortune.com/2015/10/16/vw-ferdinand-piech-culture/.

after initial emission testing failed.[18]  The prospect of failure was unacceptable, so Volkswagen decided to cheat instead.  It has been reported that the decision to cheat the EPA, CARB, and countless other regulators worldwide was an "open secret" in Volkswagen's engine development department,[19] as it was necessary for the "EA 189 engine to pass U.S. diesel emissions limits within the budget and time frame allotted."[20]

62.     All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, such as an electronic diesel control ("EDC").  Bosch tested, manufactured and sold the EDC system used by Volkswagen in the Affected Vehicles.  This system is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").  Upon its introduction, EDC Unit 17 was publicly-touted by Bosch as follows:

> … EDC17  … controls every parameter that is important for effective, low-emission combustion.
>
> Because the computing power and functional scope of the new EDC17 can be adapted to match particular requirements, it can be used very flexibly in any vehicle segment on all the world's markets.  In addition to controlling the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation, it also offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.  The Bosch EDC17 determines the injection parameters for each cylinder, making specific adaptations if necessary.  This improves the precision of injection throughout the vehicle's entire

---

[18] *VW delays Jetta TDI diesel into the US*, Clean MPG (last visited Feb. 8, 2016), http://www.cleanmpg.com/community/index.php?threads/7254/.

[19] Georgina Prodham, *Volkswagen probe finds manipulation was open secret in department*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[20] Jay Ramey, *VW chairman Poetsch: Company 'tolerated breaches of rules'*, Autoweek (Dec. 10, 2015), http://autoweek.com/article/vw-diesel-scandal/vw-chairman-poetsch-company-tolerated-breaches-rules.

service life. The system therefore makes an important contribution to observing future exhaust gas emission limits.[21]

63.     EDC Unit 17 was widely used throughout the automotive industry, including by BMW and Mercedes, to operate modern clean diesel engines. Bosch worked with each vehicle manufacturer that utilized EDC Unit 17 to create a unique set of specifications and software code to manage the vehicle's engine operation.

64.     With respect to the Affected Vehicles, however, EDC Unit 17 was also enabled by Bosch and Volkswagen to surreptitiously evade emissions regulations. Bosch and Volkswagen worked together to develop and implement a specific set of software algorithms for implementation in the Affected Vehicles, which enabled Volkswagen to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (for applicable vehicles).[22] When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations. Bosch's EDC Unit 17 gave Volkswagen the power to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. When the EDC Unit 17's detection algorithm detected that the vehicle was on a dynamometer (and undergoing an emission test), additional software code within the EDC Unit 17 downgraded the engine's power and performance and upgraded the emissions control systems' performance by switching to a "dyno calibration" to cause a subsequent reduction in emissions to legal levels. Once the EDC Unit 17 detected that the

---

[21] *See* February 28, 2006 Bosch press release, "The brain of diesel injection: New Bosch EDC17 engine management system," http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en.

[22] *See, e.g.*, *Engine management*, Bosch Auto Parts (last visited February 8, 2016), http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1.

010549-11 865477 V1

emission test was complete, the EDC Unit would then enable a different "road calibration" that caused the engine to return to full power while reducing the emissions control systems' performance, and consequently, caused the car to spew the full amount of illegal NO$_X$ emissions out on the road.[23]  This process is illustrated in the following diagram:



---

[23] Russell Hotten, *Volkswagen: The scandal explained*, BBC (Dec. 10, 2015), http://www.bbc.com/news/business-34324772.

010549-11  865477 V1

65. This workaround was illegal. The CAA expressly prohibits "defeat devices," defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

66. Thus, in order to obtain the COCs necessary to sell their vehicles, Volkswagen did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code within the EDC Unit 17 from government regulators, thus making that software an illegal "defeat device." In other words, Volkswagen lied to the government, its customers, and the public at large. An example of one of Volkswagen's vehicle stickers reflecting its fraudulently-obtained COCs is pictured below:



67.     Because the COCs were fraudulently-obtained, and because the Affected Vehicles

did not conform "in all material respects" to the specifications provided in the COC applications,

the Affected Vehicles were never covered by a valid COC, and thus, were never legal for sale,

nor were they EPA and/or CARB compliant, as represented.  Volkswagen hid these facts from

the EPA, other regulators, and consumers, and it continued to sell and lease the Affected

Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

68.     Volkswagen's illegal workaround was enabled by its close partnership with

defendant Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts

used in Volkswagen's diesel vehicles.[24]  Bosch was well aware that Volkswagen was using its

emissions control components as a defeat device and, in fact, worked with Volkswagen to

develop the software algorithm specifically tailored for the Affected Vehicles.  Although Bosch

reportedly "advised" Volkswagen as early as 2007 that the components should only be used for

internal testing, not for manipulation of the engine in emission testing,[25] it knew (or certainly

should have known) that its lip service would be ignored, and that the components would be used

as defeat devices.  Bosch supplied Volkswagen with approximately 11 million such emission

control components over seven years which, in itself, belies the official company line.

69.     Volkswagen, likewise, knew better—VW America itself is a recidivist violator of

the CAA.  In July of 1973, the EPA sought legal action against VW America from the DOJ

based on a claim that defeat devices were installed in 1973 Volkswagen vehicles.  The matter

---

[24] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel-technology operations branch of Bosch, and Volkswagen was the biggest diesel manufacturer in the world. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan. 27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff-helped-vws-emissions-rigging.

[25] *VW scandal: Company warned over test cheating years ago*, BBC (Sept. 27, 2015), http://www.bbc.com/news/business-34373637.

was swiftly settled for $120,000 the following year.[26]  And, in June of 2005, VW America

entered into a consent decree with the DOJ, wherein it paid a $1.1 million penalty for failing to

notify the EPA of emissions problems in certain vehicles manufactured by VW in Mexico.[27]

70.     Volkswagen could not help but repeat its cheating ways.  With respect to the

Affected Vehicles, Volkswagen hid the fact of the defeat devices from the EPA, such that the

COCs were fraudulently obtained.  Specifically, VW America submitted COC applications on

behalf of VWAG, Audi AG, and itself, for the 2.0-liter and VW-and Audi-branded 3.0-liter

Affected Vehicles, describing compliant specifications and concealing the dual-calibration

strategy of the defeat device.  But, the Affected Vehicles differed in "material respects" from the

specifications described in the COC applications because they were equipped with undisclosed

auxiliary emissions control devices, specifically, the software code described above, that

improperly functioned as a banned "defeat device."

71.     Because the COCs were fraudulently obtained, the Affected Vehicles were never

covered by valid COCs, and thus, were never offered legally for sale.  Volkswagen hid these

facts from the EPA, CARB and other state regulators, franchise dealers (including Plaintiffs) and

consumers, and it continued to sell and lease the Affected Vehicles through the franchise dealers,

despite their illegality, and with the complicity of Bosch.

**D.     Volkswagen Falsely Pitched Itself as a Leader in Environmental Issues**

72.     Despite Volkswagen's ascension to become the world's biggest automaker,

Volkswagen sales lagged in the United States.  Volkswagen has sought to improve sales in the

United States by touting the performance and reliability of its vehicles and its environmental

---

[26] Rich Gardellsa, *et al.*, *VW had previous run-in over 'defeat devices'*, NBC News (Sept. 23, 2015), http://www.cnbc.com/2015/09/23/vw-had-previous-run-in-over-defeat-devices.html.

[27] Consent Decree, *United States v. Volkswagen of Am., Inc.*, Case No. 1:05-cv-01193-GK (D.D.C. June 15, 2005 and Nov. 4, 2005), ECF Nos. 1-2.

leadership.  Volkswagen's 2013 Annual Report emphasizes that "Volkswagen intends to become the global economic and environmental leader among automobile manufactures by 2018" and that "[w]e are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects."  Volkswagen's false proclamations of environmental friendliness were calculated to, and did artificially increase its public goodwill and brand value, and the price dealerships paid for the rights to sell VW cars.[28]

**E.**    **Volkswagen Falsely Marketed its Diesel Engine Systems as Clean and Green**

73.    While secretly using defeat devices to bypass emission testing, Volkswagen publicly declared a landmark victory—touting that it had successfully optimized its engines to maintain legal emissions, while simultaneously enjoying the cost savings of a LNT system. Volkswagen claimed it accomplished this by monitoring and adjusting combustion conditions and using a two-stage exhaust gas recirculation system to reduce initial emissions, while neutralizing the remaining ones with a LNT to comply with U.S. law.[29]  Volkswagen branded and advertised this purportedly revolutionary technology to American consumers as "Clean Diesel" TDI technology.

74.    Volkswagen broadly boasted about the performance and environmental cleanliness of its engine systems.  In an October 2008 release, Volkswagen bragged:

> The Jetta TDI is amongst the ten most fuel efficient vehicles on the US market. In the recently published "Fuel Economy Guide 2009"

---

[28] The fraudulently inflated costs to dealers not only included amounts dealers paid to acquire dealerships and franchise rights, but also development costs.  By artificially and fraudulently inflating its brand value, VW could impose development costs, such as building new showrooms, on dealers.

[29]    *See* Hadler, *et al.*, *Volkswagen's New 2.0l TDI Engine Fulfils the Most Stringent Emission Standards*, INTERNATIONALES WIENER MOTORENSYMPOSIUM 2008; *see also Self Study Program 826803: 2.0 Liter TDI Common Rail BinS ULEV Engine*, VOLKSWAGEN OF AMERICA, INC. (2008).

the EPA (Environmental Protection Agency) listed the Jetta TDI in the top ten low consumption and low emissions vehicles.

In the current edition of the publication, the Jetta 2.0 l Clean TDI, introduced to the market two months ago, is praised particularly for its excellent consumption figures - it has a fuel consumption of 5.7 litre per 100 kilometre. Moreover, the Jetta Clean TDI also fulfils stringent Californian emission standards. This was achieved through modifications within the engine and *by implementing an exhaust treatment system developed especially by Volkswagen and which reduces nitrogen oxide emissions (NOx) by up to 90 percent*. The central element of the exhaust treatment system is the NOx storage catalytic converter.[30]

75.     Since introducing the 2.0L TDI CleanDiesel engine in 2008, Volkswagen has touted it as a "fantastic power train" that "gives very good fuel economy" and "is also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would . . . cuts out the particulate emissions by 90% and the emissions of nitrous [sic] oxide are cut by 95% . . . [and is] clean enough to be certified in all 50 states."[31]

76.     The TDI CleanDiesel engines are turbocharged and directly inject fuel into each cylinder via fuel injectors. Volkswagen has stated, "[t]he superior qualities of the 2.0 Liter TDI engine with common rail injection systems are oriented towards future challenges in acoustics, comfort, and exhaust gas after-treatment . . . confirming Volkswagen's role as a pioneer in diesel technology."

77.     Volkswagen has marketed and advertised its CleanDiesel models as extraordinarily clean, EPA certified in all 50 states, and powerful. For example, the following promotional material was used in 2010, and similar materials have been used across the spectrum of models using the CleanDiesel engine system:

---

[30] *See* http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2008/10/vw_in_fuel_economy_guide.html (last accessed Sept. 23, 2015) (emphasis added).

[31] Statement of Volkswagen Group of America, Inc.'s Chief Operating Officer Mark Barnes, to The Business Insider, October 9, 2009.



78.     Volkswagen's advertising, which keyed on the unique combination of clean, efficient, and highly performing, was very effective.  In fact, Volkswagen has become the largest seller of diesel passenger vehicles in the United States.

79.     In an October 2009 interview with Business Insider, when asked "[w]hat is the advantage of a diesel over a hybrid," VW of America's Chief Operating officer, Mark Barnes, stated: "It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it

cuts out the particulate emissions by 90% and the emissions of nitrous[sic] oxide are cut by 95%. So, a very very clean running engine. Clean enough to be certified in all 50 states."[32]

80.     Volkswagen doubled-down on "clean" and "green" vehicles. Being highly efficient, fun, and "clean" are the central messages for Volkswagen's diesel engine campaign.

81.     Volkswagen also touted the performance characteristics of the TDI CleanDiesel, claiming that clean emission technology did not sacrifice its 236 lbs/ft of torque and turbocharged CleanDiesel engine. In a recent 2015 Volkswagen Golf sales brochure, Volkswagen stated "With the 2.0L TDI engine, you'll appreciate every fuel-efficient mile with the EPA-estimated 45 hwy mpg. But that's only half the story. Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half."





---

[32] Gayathri Vaidyanathan, *Volkswagen Preps for a Diesel Revolution,* The Business Insider, Oct. 9, 2009, http://www.businessinsider.com/volkswagen-preps-for-adiesel-revolution-2009-10.

82.     Volkswagen also claimed that TDI Clean Diesel models "typically have a higher resale value versus comparable gasoline vehicles":



83.     But even when Volkswagen knew that EPA investigators had discovered—or at the very least suspected—their fraud and the defeat device, it continued to deceive its customers and its franchise dealers like Plaintiffs through false recalls and false advertising.

84.     Beginning in April 2015, Volkswagen issued VW Action Code 2306, which was a recall for CleanDiesel equipped vehicles.  Volkswagen claimed that the recall was a "repair" and that it "improved" the engine management system.  But many owners recorded a marked decrease in fuel efficiency and performance after the recall was completed.

85.     Below is a copy of the Recall Notice sent to CleanDiesel owners in April 2015:

010549-11  865477 V1



Das Auto.

Volkswagen of America, Inc.
3800 Hamlin Road
Auburn Hills, MI 48326

April 2015

**This notice applies to your vehicle:**

Subject:     **Emissions Service Action 23O6 – ECM Software**
             **Certain 2010-2014 Model Year Volkswagen Vehicles Equipped with a 2.0L TDI®**
             **Clean Diesel Engine**

Dear Volkswagen Owner,

As part of Volkswagen's ongoing commitment to our environment, and in cooperation with the United States Environmental Protection Agency and the California Air Resources Board, we are informing you of our decision to conduct an emissions service action on certain 2010-2014 model year Volkswagen vehicles equipped with a 2.0L TDI® Clean Diesel engine. Our records show that you are the owner of a vehicle affected by this action.

| | |
|---|---|
| **What is the issue, and what will we do?** | The vehicle's engine management software has been improved to assure your vehicle's tailpipe emissions are optimized and operating efficiently. Under certain operating conditions, the earlier strategy may have increased the chance of the vehicle's MIL light illuminating. If the MIL illuminates for any reason, your vehicle will not pass an IM emissions inspection in some regions. |
| | To address this issue, your authorized Volkswagen dealer will update the ECM software in your vehicle. This work will take about one hour to complete and will be performed for you free of charge. Please keep in mind that your dealer may need additional time for the preparation of the repair, as well as to accommodate their daily workshop schedule. |

> **IMPORTANT!**
> Please note that if the ECM in your vehicle has been "chipped," "tuned," or otherwise modified from original factory specifications with aftermarket components and/or software, work needed to repair, replace, or return the ECM to original factory specifications is NOT covered under this action.

| | |
|---|---|
| **What should you do?** | In order to limit any possible inconvenience, please contact your authorized Volkswagen dealer as soon as possible to schedule this service. |

23O6/D8 CALI

86.    But after having the recall installed, A3 owners made posts on enthusiast blogs

such as the following two posts:

> Had my update done couple weeks ago and I've noticed a sizable
> performance hit afterwards, compared to previous tanks pre-
> update.
> 38.00 MPG
> 36.42 MPG
> 37.77 MPG

010549-11  865477 V1

37.51 MPG
37.05 MPG
//////Recall performed
34.13 MPG
33.12 MPG

edt: real data...
bought car in jan in CA (first two is drive back)
38.14
36.63
32.10
32.99
32.77
32.15
29.94 (recall done during this tank)
26.67
25.79
26.10

87. Volkswagen continued its aggressive campaign to dupe its customers and dealers into believing its cars were clean and environmentally friendly. In advertisements appearing on its webpage as recently as September 21, 2015, Volkswagen extended the deceit. These ads have now been stripped from Volkswagen's websites.



88. Volkswagen's now dubious concern for the environment extended beyond its CleanDiesel campaigns. On the "Environment" page of its website, Volkswagen claims that it takes "environmental responsibility very seriously. When it comes to making our cars as green as

010549-11  865477 V1

possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing totally new power systems, which utilize new fuel alternatives."

89.     Volkswagen trumpeted its apparent environmental *bone fides* when the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year.  Ironically, the tag line of the most recent CleanDiesel advertisements was "***Promise kept***."[33]

90.     On the Volkswagen CleanDiesel webpage, it continued to mislead consumers, touting the supposedly reduced greenhouse gas emission of the CleanDiesel engine system.[34]



91.     Through its "Think Blue" program, Volkswagen claimed to have a policy of being "more responsible on the road and more environmentally conscious—not just in our cars." But whether Volkswagen had any care at all for the environment is now, at best, debatable.

---

[33] *See* http://www.vw.com/features/clean-diesel/ (last visited Sept. 21, 2015). The content has since been removed.

[34] *See* http://www.audiusa.com/technology/efficiency/tdi?csref=116751439289858719 (last visited Sept. 21, 2015). The content has since been removed.

92.     On its website to promote its "clean" diesel technology,

www.clearlybetterdiesel.org, Volkswagen falsely claimed that its CleanDiesel engine system

reduces smog and "meets the highest standards in all 50 states, thanks to ultra-low sulfur diesel

(ULSD) fuel and innovative engine technology that burns cleaner."

**F.      Volkswagen's CleanDiesel Engine Systems Were a Fraud**

93.     Defendants' illegal scheme started to unravel approximately five years after

Volkswagen introduced its first diesel model containing the defect device into the U.S. stream of

commerce.  In May 2014, West Virginia University's Center for Alternative Fuels, Engines &

Emissions published results of a study commissioned by the International Council on Clean

Transportation ("ICCT"), which found that certain of the Class Vehicles' real world $NO_X$ and

other emissions exceeded the allowable EPA emission standards.[35]

94.     The ICCT researchers had been comparing the real-world performance of "clean"

diesel vehicles in Europe with reported results and noted numerous discrepancies.  Since the U.S.

emission regulations were significantly more stringent than its European counterparts, the ICCT

sought to test the equivalent U.S. "clean" diesel cars, presuming that they would run cleaner.

West Virginia University was a qualified and enthusiastic partner, as they had already been

engaged in the study of heavy truck emissions.

95.     Shockingly, the study showed that, contrary to testing lab results, real world

driving of Volkswagen "clean" diesel vehicles produced levels of $NO_X$ up to 40 times higher

than legal limits promulgated by the EPA and CARB:

---

[35] *See Final Report: In Use Emissions Testing of Light-Duty Diesel Vehicles in the United States*, International Council on Clean Transportation (May 15, 2015), http://www.theicct.org/sites/default/files/publications/WVU_LDDVin-use_ICCT_Report_Final_may 2014.pdf.



**Average emissions of nitrogen oxides in on-road testing**

Source: Arvind Thiruvengadam, Center for Alternative Fuels, Engines and Emissions at West Virginia University

96.     The results of this study prompted an immediate investigation by the EPA and CARB, both of whom demanded an explanation from Volkswagen.  Despite knowing that the Class Vehicles contained illegal emission systems—and defeat devices intentionally designed to comply with emission standards on a test bench but not under normal driving operation and use—Volkswagen failed to come clean.  Instead, Volkswagen denied the allegations and blamed faulty testing procedures.

97.     In December 2014, Volkswagen issued a recall purportedly to update emission control software in the Class Vehicles, and CARB (along with the EPA) conducted follow-up testing of the Class Vehicles in the laboratory and during normal road operation.  CARB attempted to identify the source and nature of the Class Vehicles' poor performance and determine why their on-board diagnostic systems did not detect the increased emissions.  None

of the technical issues suggested by Volkswagen adequately explained the $NO_X$ test results as confirmed by CARB.

98.     Dissatisfied with Volkswagen's explanations, EPA and CARB officials finally threatened to withhold the COCs for Volkswagen's 2016 diesel vehicles until it adequately explained the anomaly of the higher emissions.  Then, and only then, did Volkswagen finally relent and start to lift the curtain on its illegal scheme.

**G.     Once Caught, Volkswagen Admitted its Fraud—in Part, but Simultaneously Sought to Cover Up the Scope of Its Deceit**

99.     On September 3, 2015, Volkswagen officials finally disclosed at a meeting with the EPA and CARB that it had installed a sophisticated software algorithm on the 2.0-liter Class Vehicles, which could detect when the car was undergoing emission testing on a test bench and switch the car into a cleaner running mode.  During that meeting, Volkswagen admitted that the software was a "defeat device" forbidden by the CAA and state regulations.

100.     On September 18, 2015, the EPA issued a Notice of Violation of the CAA (the "First NOV") to VWAG, Audi AG, and VW America for installing illegal defeat devices in 2009-2015 Volkswagen and Audi diesel cars equipped with 2.0-liter diesel engines.  That same day, CARB sent a letter to VWAG, Audi AG, and VW America, advising that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the First NOV.

101.     Two days later, Volkswagen made its first public admission of wrongdoing in a written statement and video by VWAG's then-CEO Winterkorn (who would soon resign as a result of this scandal), posted on VWAG's website.  Winterkorn's statement read, in pertinent part:

> I personally am deeply sorry that we have broken the trust of our customers and the public. We will cooperate fully with the responsible agencies, with transparency and urgency, to clearly, openly, and completely establish all of the facts of this case.

Volkswagen has ordered an external investigation of this matter. . . . We do not and will not tolerate violation of any kind of our internal rules or of the law.[36]

102.     In his video, Winterkorn further apologized by stating:

The irregularities in our group's diesel engines go against everything Volkswagen stands for. To be frank with you, manipulation at Volkswagen must never happen again. . . . I personally am deeply sorry that we have broken the trust of our customers. I would like to make a formal apology to our customers to the authorities and to the general public for this misconduct.[37]

103.     That same day, Volkswagen confirmed that it had ordered dealers to stop selling both new and used vehicles with 2.0-liter diesel engines.[38]  Volkswagen continued to sell its 3.0-liter diesel models, despite containing similar, but not-yet-disclosed defeat devices.

104.     On September 21, 2015, Volkswagen spokesman John Schilling stated in an email that Volkswagen was "committed to fixing this issue as soon as possible" and to "developing a remedy that meets emissions standards and satisfies our loyal and valued customers."[39]

105.     Michael Horn, President and CEO of VW America, echoed this sentiment when he took the stage later that evening at a launch event for the 2016 Volkswagen Passat in Brooklyn, New York, telling reporters:

---

[36] *See Statement of Prof. Dr. Martin Winterkorn, CEO of Volkswagen AG*, Volkswagen AG (Sept. 20, 2012), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/statement_ceo_of_volkswagen_ag.html.

[37] *See* Joe Lorio, *VW Chairman Martin Winterkorn Releases Video Addressing Scandal, Is Not Stepping Down*, Car and Driver (Sept. 22, 2015), http://blog.caranddriver.com/vw-chairman-martin-winterkorn-releases-video-addressing-scandal-is-not-stepping-down/.

[38] Jack Ewing, *Volkswagen to Stop Sales of Diesel Cars Involved in Recall*, N.Y. Times (Sept. 20, 2015), http://www.nytimes.com/2015/09/21/business/international/volkswagen-chief-apologizes-for-breach-of-trust-after-recall.html.

[39] Jad Mouawad, *et al.*, *The Wrath of Volkswagen's Drivers*, N.Y. Times (Sept. 21, 2015), http://www.nytimes.com/2015/09/22/business/the-wrath-of-volkswagens-drivers.html.

> Our company was dishonest, with the EPA and the California Air Resources Board, and with all of you and in my German words, **we have totally screwed up**. We have to make things right, with the government, the public, our customers, our employees and also very important, our dealers.[40] (Emphasis added.)

106.    Horn's presentation on the new Passat, notably, did not promote the environmental efficiency of the car's "clean" diesel model.

107.    On September 22, 2015, Volkswagen announced that 11 million diesel cars worldwide were installed with the same defeat device software that had evaded emission testing by U.S. regulators.  Contemporaneously, Volkswagen announced that it had set aside reserves of 6.5 billion euros ($7.3 billion) in the third quarter to address the matter.[41]

108.    On September 23, 2015, Winterkorn resigned from his position as CEO of VWAG.  In his resignation statement, Winterkorn insisted that he was not personally involved in the emissions scandal: "Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group. I am doing this in the interests of the company even though I am not aware of any wrongdoing on my part."[42]

109.    Following Winterkorn's resignation, Volkswagen released a statement that it had set up a special committee to lead its own inquiry into the scandal and expected "further personnel consequences in the next days."  It added: "The internal group investigations are

---

[40] Christine Seib, *Volkswagen's US Boss: We Totally Screwed Up*, CNBC (Sept. 22, 2015), http://www.cnbc.com/2015/09/21/volkswagen-us-ceo-screwed-up-on-eca-emissions-diesel-test-rigging.html.

[41] Nathan Bomey, *Volkswagen Emission Scandal Widens: 11 Million Cars Affected*, USA Today (Sept. 22, 2015), http://www.usatoday.com/story/money/cars/2015/09/22/volkswagen-emissions-scandal/72605874/.

[42] Graham Ruddick, *Volkswagen chief quits over emissions scandal as car industry faces crisis*, The Guardian (Sept. 23, 2015), http://www.theguardian.com/business/2015/sep/23/volkswagen-chief-martin-winterkorn-quits-emissions-scandal.

continuing at a high tempo. All participants in these proceedings that have resulted in immeasurable harm for Volkswagen will be subject to the full consequences." However, the committee insisted that Winterkorn "had no knowledge of the manipulation of emissions data."[43]

110.    On September 25, 2015, Matthias Müller, the Chairman of Porsche AG, was named as Winterkorn's successor. Immediately upon assuming his new role, Müller issued a press release stating:

> My most urgent task is to win back trust for the Volkswagen Group—by leaving no stone unturned and with maximum transparency, as well as drawing the right conclusions from the current situation. Under my leadership, Volkswagen will do everything it can to develop and implement the most stringent compliance and governance standards in our industry.[44]

111.    Meanwhile, in Auburn Hills, Michigan, where VGoA houses its Information Technology Group, VW employees were ignoring a Department of Justice Directive to stop deleting and maintain any electronic records related to the Dieselgate scandal. In a lawsuit filed March 8, 2016, a former VW Technical Manager named Daniel Donovan alleges that he was fired for his refusal to participate in, and attempt to stop, destruction of electronic evidence relevant to the Dieselgate scandal.

112.    Donovan alleges in his lawsuit that on the day the NOV was issued, September 18, 2015, he was instructed by his supervisor, Robert Arturi, to contact VW Executive Vice President and Chief Information Officer, Abdallah Shanti, and advise him to "stop deleting data effective immediately pursuant to a Department of Justice hold." Donovan further alleges that when he relayed this message to Shanti, Shanti swore at him and did not stop deletion jobs at VW until September 21, 2015. Donovan alleges that thereafter, VW did not stop deleting back-

---

[43] *Id.*

[44] *Matthias Müller appointed CEO of the Volkswagen Group*, Volkswagen AG (Sept. 25, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/CEO.html.

up data relevant to the Dieselgate scandal, even though it knew that it was supposed to preserve such back-ups. And he alleges that VW did not provide to its outside investigator full access to the electronically stored information available. Finally, Donovan alleges that after contacting VW's Office of General Counsel to report his concerns with these practices, he was fired in retaliation for whistle-blowing.[45]

113.    On October 8, 2015, Horn made frank admissions of culpability in his testimony before the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations.  Under oath, Horn testified: "On behalf of our Company, and my colleagues in Germany, I would like to offer a sincere apology for Volkswagen's use of a software program that served to defeat the regular emissions testing regime."[46]  In response to a question from the Subcommittee Chairman, Representative Tim Murphy, whether the software was installed "for the express purpose of beating tests," Horn testified, "it was installed for this purpose, yes."[47]

114.    On November 2, 2015, the EPA issued a second Notice of Violation of the CAA (the "Second NOV") to VWAG, Audi AG, and VW America, this time directed at the larger 3.0-liter, 6-cylinder diesel models—the same vehicles that Volkswagen continued to sell through its dealers after the First NOV.[48]  The Second NOV, which was also issued to Porsche AG and Porsche America, alleged that Volkswagen had installed illegal defeat devices in certain vehicles equipped with 3.0-liter diesel engines for model years 2014-16.  Although not identical, the

---

[45] *See Donovan v. Volkswagen Group of America*, *Inc. and Abdallah Shanti*, Case No. 2016-151877-CD (Oakland County Circuit Court March 8, 2016).

[46] *Supra* note 1.

[47] *Id.*

[48] Letter from Susan Shinkman, Director, EPA Office of Civil Enforcement to Volkswagen dated Nov. 2, 2015, http://www.epa.gov/sites/production/files/2015-11/documents/vw-nov-2015-11-02.pdf.

cheating alleged of Volkswagen in the Second NOV concerned essentially the same mechanism Volkswagen used—and admitted to using—in the First NOV.

115.    However, shortly after it received the Second NOV, Volkswagen fired back at the EPA's new claims of fraud, denying that it installed defeat device software in the identified 3.0-liter diesel vehicles.  In response to the Second NOV, Volkswagen issued the following bold statement: "Volkswagen AG wishes to emphasize that no software has been installed in the 3.0-liter V6 diesel power units to alter emissions characteristics in a forbidden manner."[49]

116.    Yet, the following day, despite Volkswagen's insistence that the 3.0-liter diesel emission system was legal, Volkswagen ordered dealers to stop selling all six models at issue in the Second NOV, in addition to the Audi Q7, which was also equipped with a 3.0-liter diesel engine.[50]

117.    On November 4, 2015, following its directive to halt sales of the 3.0-liter diesel models, Volkswagen announced that an internal investigation revealed "unexplained inconsistencies" with the carbon-dioxide output of 800,000 of its gasoline-powered vehicles.[51]

118.    On November 22, 2015, after almost three weeks of denying the EPA's allegations contained in the Second NOV, Audi finally admitted that defeat device software was installed in all of its diesel vehicles.  Specifically, Audi stated that it had failed to disclose three auxiliary emissions control devices in its 3.0-liter diesel engines to U.S. regulators, and further

---

[49] Emily Field, *Volkswagen Slams Newest EPA Emissions Fraud Claims*, Law360 (Nov. 3, 2015), http://www.law360.com/articles/722478/volkswagen-slams-newest-epa-emissions-fraud-claims.

[50] Paul Lienert, *Volkswagen tells dealers to stop selling some 3.0 V6 diesel models*, Reuters (Nov. 4, 2015), http://www.reuters.com/article/us-volkswagen-emissions-stopsale-idUSKCN0ST2E420151104.

[51] Benedikt Kammel, *VW Emissions Issues Spread to Gasoline Cars*, Bloomberg (Nov. 3, 2015), http://www.bloomberg.com/news/articles/2015-11-03/volkswagen-emissions-woes-deepen-as-800-000-more-cars-affected.

admitted: "One of them is regarded as a defeat device according to applicable U.S. law.
Specifically, this is the software for the temperature conditioning of the exhaust-gas cleaning
system."[52]  This admission came almost three months after Volkswagen's initial, more limited
*mea culpa*.

119.    Still, despite the admissions and apologies that followed each time a Volkswagen
lie was exposed, it became apparent that Volkswagen was not ready to fully accept responsibility
for its actions.  Indeed, merely one month after Volkswagen admitted to the findings in the
Second NOV, Hans-Gerd Bode, Volkswagen's Group Communications Chief, told a group of
reporters: "I can assure you that we certainly did not, at any point, knowingly lie to you. . . .  We
have always tried to give you the information which corresponded to the latest level of our own
knowledge at the time."[53]

120.    On January 4, 2016, the DOJ, on behalf of the EPA, filed a civil complaint against
VWAG, VW America, Volkswagen Group of America Chattanooga Operations LLC, Audi AG,
Audi, Porsche AG, and Porsche America for injunctive relief and the assessment of civil
penalties for their violations of the CAA.  In addition to alleging the various violations of the
CAA, the complaint states that the Defendants impeded the government's efforts to learn the
truth about the emission irregularities related to the Class Vehicles with material omissions and
misleading information.

121.    On January 10, 2016, in an interview with NPR at the North American
International Auto Show, Müller claimed that Volkswagen ***did not lie*** to U.S. regulators about

---

[52] *Statement on Audi's discussions with the US environmental authorities EPA and CARB*,
Volkswagen AG (Nov. 23, 2015),
http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/11/epa.html.

[53] Andreas Cremer, *Das Auto' no more: Volkswagen plans image offensive*, Reuters (Dec. 22,
2014), http://www.reuters.com/article/us-volkswagen-emissions-communications-i-
idUSKBN0U514L20151222.

emissions problems with its diesel engines, and suggested that the whole thing had been a misunderstanding of U.S. law.  Müller stated:

> Frankly spoken, it was a technical problem. We made a default, we had a . . . not the right interpretation of the American law. And we had some targets for our technical engineers, and they solved this problem and reached targets with some software solutions which haven't been compatible to the American law. That is the thing. And the other question you mentioned—it was an ethical problem? I cannot understand why you say that. . . . We didn't lie. We didn't understand the question first. And then we worked since 2014 to solve the problem.[54]

122.    Moreover, since the fraud was first exposed, Volkswagen has consistently denied that its top executives were involved with, or had knowledge of, the fraudulent scheme, instead pinning the blame on the work of a few rogue engineers.

123.    As an alternative tactic, during Horn's Congressional hearing on October 8, 2015, Horn testified that the installation of the defeat device in certain Volkswagen diesel vehicles was the work of "a couple of software engineers who put this in for whatever reason."[55]  Horn's explanation is not only contrary to prior admissions, but entirely implausible.

124.    To date, at least a dozen of Volkswagen's top executives have either resigned under pressure or been fired.  Among the top executives dismissed are Winterkorn, CEO and Chairman of Volkswagen, who resigned almost immediately once the scandal became public; Dr. Ulrich Hackenberg, a top engineering boss in the Audi Group, who was suspended and later resigned; Heinz-Jakob Neusser, described as a Volkswagen "development" boss, who was suspended and later resigned; and Wolfgang Hatz, Porsche's "development" boss and previously

---

[54] Sonari Glinton, *'We Didn't Lie,' Volkswagen CEO Says Of Emissions Scandal*, NPR (Jan. 11, 2016), http://www.npr.org/sections/thetwo-way/2016/01/11/462682378/we-didnt-lie-volkswagen-ceo-says-of-emissions-scandal.

[55] Paul A. Eisenstein, *Could Rogue Software Engineers Be Behind VW Emissions Cheating?*, NBC News (Oct. 9, 2015), http://www.nbcnews.com/business/autos/could-rogue-software-engineers-be-behind-vw-emissions-cheating-n441451.

Volkswagen's head of engine development, who was suspended and then resigned. Furthermore, one of Volkswagen's top advertising executives purportedly "resigned" (although the company has said that the resignation was unrelated to the present scandal), and VW America has replaced their general counsel and head of public affairs, David Geanacopoulos. Just recently Frank Tuch, VWAG's head of quality assurance, also resigned, his departure likely tied to leadership overhauls as Volkswagen's internal investigations continue. Finally, Michael Horn, the centerpiece of VW's Congressional responses and head of VGoA, has also recently departed the company.

125.    That a few rogue engineers could orchestrate this massive, worldwide scheme is implausible not only because of the firings of the above-listed executives, but also because Volkswagen has been implicated using not just one, but *two* sophisticated defeat device software programs, in *two* separate engines designed and manufactured by different engineers in different corporate facilities. In addition, more than a dozen different Affected Vehicles, involving three separate brands—Volkswagen, Audi and Porsche—have been implicated in a fraud that began more than a decade ago.

126.    On October 17, 2015, Reuters reported that anonymous insiders, including a Volkswagen manager and a U.S. official close to the government's investigation of the company, claimed that Volkswagen made several modifications to its emission defeat device software over the seven years the company has admitted to cheating.[56] Such incremental updates to the software, which were made to accommodate new generations of engines during that timeframe, evidences a larger group of employees making an ongoing effort to continue their deception.

---

[56] Andreas Cremer, *et al.*, *VW made several defeat devices to cheat emissions tests: sources*, Reuters (Oct. 17, 2015), http://www.reuters.com/article/us-volkswagen-emissions-software-idUSKCN0SB0PU20151017.

127.    As discussed above, on January 22, 2016, Germany's *Sueddeutsche Zeitung* newspaper reported that Volkswagen's development of defeat device software to cheat diesel emissions tests was an "open secret" in its engineering development department.  Staff members in engine development have stated that they felt pressure from the top of Volkswagen's corporate hierarchy to find a cost-effective solution to develop clean diesel engines to increase U.S. market share.  Rather than concede that such engines could not be built (*i.e.*, were "impossible" as R&D chief Hatz once proclaimed), the development team decided to push ahead with manipulation.[57]

128.    Quoting documents from Volkswagen's internal investigation, which included testimony from a staff member who took part in the fraud, the German newspaper said: "Within the company there was a culture of 'we can do everything', so to say something cannot be done, was not acceptable. . . .  Instead of coming clean to the management board that it cannot be done, it was decided to commit fraud."[58]  The newspaper further reported that staff in Volkswagen's engine development department took comfort from the fact that regulators would not be able to detect the fraud using conventional examination techniques.

129.    The role of Volkswagen's top management in the fraud has recently come under increased scrutiny after reports have emerged that Winterkorn was aware that Volkswagen was rigging emissions tests on its vehicles more than a year before the scandal emerged, yet did nothing to stop the practice.[59]

---

[57] Georgina Prodhan, *Volkswagen probe finds manipulation was open secret in department: newspaper*, Reuters (Jan. 23, 2016), http://www.reuters.com/article/us-volkswagen-emissions-investigation-idUSKCN0V02E7.

[58] *Id.*

[59] Geoffrey Smith, *VW's ex-CEO Winterkorn 'Knew About Defeat Device in Early 2014*,' Fortune (Feb. 15, 2016), http://fortune.com/2016/02/15/vw-ceo-winterkorn-defeat-device/.

130.    According to German newspaper *Bild-Zeitung*, Winterkorn and other high-level Volkswagen managers were warned by a senior executive about the risk of a U.S. investigation into the use of the defeat devices back in May 2014.[60]  The newspaper reported that the warning came in the form of a letter from Bernd Gottweis, an employee known internally as the "fire-fighter," who led a team called the "Product Safety Taskforce," which concentrated on crisis prevention and management.  The letter, which was uncovered by the internal investigation carried out on Volkswagen's order, stated: "There is no well-founded explanation for the dramatically higher NOX emissions that can be given to the authorities.  It is to be suspected, that the authorities will examine the VW systems to see whether Volkswagen has installed engine management software (a so-called Defeat Device)."

131.    The newspaper also reported that a senior Volkswagen manager had admitted the true level of emissions to a CARB official on August 5, 2015, over a month before the EPA issued the First NOV I, and that Volkswagen brand chief Herbert Diess had convened meetings on August 24th and August 25th to discuss how to react to the scandal that was about to break.[61]

132.    The letter, of which *Bild-Zeitung* claims to have a copy, is the second leak suggesting that knowledge of the emissions problems and use of the defeat devices extended far higher, far earlier, than Volkswagen has admitted.  Indeed, the German magazine *Manager* has reported that Volkswagen's management had already discussed the issue in the spring of 2014 in reference to a letter received from the EPA.[62]  The revelations from these reports directly contradict arguments made by Winterkorn and Horn that they were unaware of the use of defeat devices applied specifically to circumvent U.S. regulations.

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

133.    At a December 10, 2015, press conference, during which Volkswagen discussed preliminary results of their internal investigation, executives summed up the state of affairs, and admitted that Volkswagen had installed defeat devices to take shortcuts around engineering challenges.  Faced with "[s]trict and significantly toughening $NO_X$ limits," Volkswagen knew those "$NO_X$ limits could not be met with [their] technological design" for lean $NO_X$ traps so instead they dealt with the problem by installing defeat devices.  The Affected Vehicles with urea treatments faced a separate problem: the urea tanks were too small for consumers to maintain urea levels at standard maintenance intervals.  Volkswagen also took shortcuts around these engineering challenges by implementing a defeat device to reduce urea consumption and illegally stretch the capacity of its urea tanks outside of test conditions.  Volkswagen concluded this presentation by implicitly acknowledging the toxicity of its corporate culture, as Volkswagen announced it would establish a "new mindset" among Volkswagen leadership that has "[m]ore capacity for criticism."[63]

134.    The entire after-the-fact chronology and explanation of how and why Volkswagen perpetrated its fraud is set forth in its December 10, 2015, presentation, as follows:

---

[63] *Volkswagen AG, The Volkswagen Group is moving ahead: Investigation, customer solutions, realignment*, Volkswagen AG (Dec. 10, 2015), http://www.volkswagenag.com/content/vwcorp/info_center/en/talks_and_presentations/2015/12/Presentation_MUE_POE.bin.html/binarystorageitem/file/2015_12_10_Pr%C3%A4sentation+PK_Final_ENG.pdf.

010549-11  865477 V1



135. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than were certified to the EPA, Volkswagen violated the Clean Air Act, defrauded its customers and dealers, placed in commerce vehicles that were illegal to drive on

U.S. roadways, and engaged in a criminal conspiracy. It breached its dealer agreements and violated state and federal laws designed to protect franchise dealers from coercive, fraudulent, and intimidating acts by powerful vehicle manufacturers.

136.    Moreover, Volkswagen's fraud harmed not just the customers it duped into buying its heavily polluting "CleanDiesels," but it harmed the environment. Through six years of fraud, Volkswagen put on the United States roadways over 483,000 cars that spewed up to 40 times the permitted level of NOx and other pollutants. These emissions invariably have harmed the air quality and environment and, as a result, harmed the United States and its citizens. And these acts, no doubt, have and will harm the goodwill value of any franchise dealership that sells VW products.

137.    The harm Volkswagen has caused by selling its illegally polluting "CleanDiesel" cars is ongoing and will be for many months, if not years. Horn testified before Congress on October 8, 2015, admitting the purposeful use of the defeat device by Volkswagen to defraud regulators and its customers. Horn testified that any fix for at least 420,000 of the Affected Vehicles would require *software and hardware* changes and would take at least many months, and perhaps years to implement.[64] All the while, Volkswagen is not offering replacement cars or a buyback program, thereby forcing unhappy and embarrassed owners to knowingly spew noxious fumes into the environment or make alternative arrangements at their own sole expense.

138.    Concomitant to the hundreds of thousands of defrauded and unhappy consumers is a direct and measurable harm to franchise dealers who are now faced with their most loyal and engaged customers feeling profoundly betrayed by Volkswagen: a betrayal that consumers associate directly with the face of Volkswagen that they dealt with—the dealers. The legion

---

[64] *See* http://www.autonews.com/article/20151008/OEM02/151009826/older-vw-diesels-will-need-software-and-hardware-fixes-horn-tells.

bitterly disappointed Volkswagen owners distance themselves from dealers and have turned 180 degrees from reliable referral sources to vocal detractors.

139. Beyond the loss of customers, franchise dealers, including Plaintiffs, have been stuck with unsalable cars, new, used, and certified used, that take up valuable inventory space and carrying costs. Further, thousands of customers who might be ready to trade-in or trade-up their Affected Vehicles and buy new cars from dealers cannot do so because the value of the Affected vehicles has so precipitously plummeted.

140. Plaintiffs and the Franchise Dealer Class have invested millions, collectively hundreds of millions of dollars in the Volkswagen brand, expecting a return concomitant with the value of the brand up until the dieselgate scandal became public. But now the brand value has plummeted, sales of VW diesels have completely halted, and sales of all VW cars have plummeted. Plaintiffs and the Franchise Dealer Class now own VW dealerships that lose money day after day, or at best make far less money than they did prior to the disclosure of the massive dieselgate emissions scandal.

## H. Volkswagen Profited From its Dieselgate Fraud

141. Volkswagen has charged a substantial premium for the Affected Vehicles, ironically marketed by Volkswagen as "CleanDiesel." For example, for the 2015 Volkswagen Jetta, the base S model has a starting MSRP of $18,780. The base TDI S CleanDiesel, however, has a starting MSRP of $21,640, a price premium of $2,860. The CleanDiesel premium for the highest trim Jetta model is substantially higher. The highest level gas Jetta SE has a starting MSRP of $20,095, while the CleanDiesel TDI SEL MSRP is $26,410, a staggering $6,315 premium.

142. These premiums occur across all of the vehicles lines in which Volkswagen installed its defeat device for emissions testing. The table below sets forth the price premium in

2015 for each base, mid-level and top-line trim for each affected model. Similar premiums existed for each Affected Vehicle for every model year:

**2015 CleanDiesel Price Premiums**

| Model | Base | Mid-level | Top-line |
|-------|------|-----------|----------|
| *VW Jetta* | $2,860 | $4,300 | $6,315 |
| *VW Beetle* | $4,635 | n/a | $2,640 |
| *VW Golf* | $2,950 | $1,000 | $1,000 |
| *VW Passat* | $5,755 | $4,750 | $6,855 |
| *Audi A3* | $2,805 | $3,095 | $2,925 |

143. The ability of Plaintiffs and the Franchise Dealer Class to sell these vehicles at a premium was a significant contributor to the high value of goodwill and franchise rights associated with owning a Volkswagen dealership. Since the NOV, however, there are no such premiums because the Affected Vehicles cannot be legally sold in the U.S., and all Volkswagen sales have been negatively affected by the diminution in brand value and brand loyalty. As a result, franchise dealer profitability and franchise value have markedly decreased.

I. **Volkswagen's False Advertising and Fraud Has Profoundly Harmed Franchise Dealers**

144. As set forth above, consumers paid large premiums to purchase Affected Vehicles. They paid these premiums as a result of Volkswagen's false claims that the CleanDiesel engine system was environmentally friendly, clean, efficient, and EPA compliant. Dealers, in turn, stocked large numbers of the Affected Vehicles and paid top dollar for trade-ins, knowing that (prior to the NOV) they held value remarkably well and could be sold used and/or "certified" for top dollar.

145.    As a direct result of the disclosure of Volkswagen's CleanDiesel fraud, Affected Vehicles have sharply decreased in value and are presently unsalable.  In fact, Volkswagen has halted all sales of Affected Vehicles, new or used, so that its dealers are stuck with Affected Vehicles that they cannot sell.  Within two weeks of the announcement of Volkswagen's emissions fraud the following decreases in model values were documented:

**Diesel models (MY 2009 – 2015):**

|  | Pre-Announcement | Post-Announcement | Percent change |
|---|---|---|---|
| **Audi** | **$16,075** | **$16,085** | **0.1%** |
| A3 | $16,075 | $16,085 | 0.1% |
| **Volkswagen** | **$12,822** | **$11,146** | **-13.1%** |
| Beetle | $16,197 | $13,852 | -14.5% |
| Golf | $13,551 | $12,069 | -10.9% |
| Jetta | $11,901 | $10,248 | -13.9% |
| Passat | $16,586 | $15,253 | -8.0% |
| **Grand Total** | **$12,830** | **$11,160** | **-13.0%** |

Each Franchise Dealer Class member therefore suffered a direct pecuniary loss in the form of the decreased value of the Affected Vehicles in their new and used dealership inventory.[65]

146.    The loss in value is particularly acute and affects Plaintiffs and Franchise Dealer Class members because consumers do not want to own cars that pollute and harm the environment.  Cleanliness was the core of Volkswagen's marketing efforts and a driving factor in purchase decisions.  Franchise Dealer Class members want to sell their Affected Vehicles but they cannot legally do so, and instead must store them at least until Volkswagen successfully deploys an approved fix (for which there is presently no time table). Franchise Dealer Class members are also saddled with the expense of secure storage costs for these vehicles.

147.    Moreover, many Franchise Dealer Class members purchased their inventory with financing or have limited cash available for inventory—new and used.  Because the Affected

---

[65] *See* http://www.buzzfeed.com/matthewzeitlin/resale-value-of-vw-diesels-down-13-percent#.kvRJEo96L.

Vehicles are unsalable, Franchise Dealer Class members cannot shift their inventory investments to vehicles that they can sell, meaning that they have fewer non-diesel vehicles in their showrooms and inventory, leading to additional loss of sales and diminution in franchise value.

148.     Volkswagen has been ordered by the EPA to recall the Affected Vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation.  However, Volkswagen will not be able to make the Affected Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and their efficiency.  As a result, even if Volkswagen is able to make the Affected Vehicles EPA compliant, Franchise Dealer Class members will nonetheless suffer actual harm and damages because the vehicles on their lots will no longer perform as they did when purchased and as advertised.  This will necessarily result in a diminution in value of every Affected Vehicle and a diminution in inventory value, franchise value, and brand value of VW.

149.     Further compounding the harm to Franchise Dealer Class members is that as of the date of this filing, Volkswagen has provided no guidance directly to customers or to its dealer network.  Concerned owners of Affected Vehicles have been told absolutely nothing about what will happen to their cars, whether they are legal to drive in their states, what Volkswagen intends to do, or what owners should do.  Instead, calls to Volkswagen either go unanswered, or are answered with "we don't know." This dearth of information further sullies the name and brand value of Volkswagen, driving down goodwill and franchise value.

150.     As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Affected Vehicles emit up to 40 times the allowed levels, franchise dealers have suffered losses in money and/or property.  Had Plaintiffs and Franchise Dealer Class members known of the defect device at the

time they purchased their franchise, or entered into dealer agreements to maintain their franchise

or purchase inventory, they would not have purchased or maintained their franchise, would not

have purchased inventory in the quantity, or at the prices that they paid, or would have paid

substantially less for the franchise or to continue as a franchise.

**J.    Volkswagen's Refusal to Take Any Prompt Action to Remedy its Fraudulent Scheme Continues to Profoundly Harm Consumers, Franchise Dealers and the Environment**

151.    For decades, consumers who have been buying VWs were not just buying cars;

for many, the purchase also made a statement about contributing to a cleaner environment.  This

consumer sentiment and substantial consumer loyalty was a significant contributing factor to the

value of owning a franchise dealership that sold and serviced Volkswagen cars. VW purchasers

were proud of their choice, as were dealers operating VW franchises.  This is true, and perhaps

even especially true, for those who purchased, and dealers who sold, vehicles with the "Clean

Diesel" engine in 2009-2015, including the Jetta, Beetle, Passat, and Audi A3, the Golf in 2012-

2015 and vehicles equipped with the larger 3.0 liter diesel engines from 2009-15, including VW

Taureg, Audi A6 and A8, and Porsche Cayenne.  Owning and driving these CleanDiesel cars was

a source of pride for consumers, and, as a result, selling them was a source of pride and profit for

franchise dealers and created substantial goodwill and value in owning and operating a VW

franchise.

152.    Now, consumers report their pride has turned to humiliation, knowing they are

driving vehicles—and are *seen* driving vehicles—that are spewing oxides of nitrogen emissions

far in excess of what is legal or responsible.  This is not the choice consumers made.  Likewise, it

is not the choice that franchise dealers, including Plaintiffs made.  They bought into and have

invested substantially in the VW brand based on its prior reputation for remarkable engineering

and environmentally friendly culture and product offerings.  That brand is now demonstrably and

permanently tainted. VW is known as a liar and a cheat; and that image is reflected on Plaintiffs and Franchise Dealer Class members as they are the sole point of interaction with consumers.

153.    This sharply negative consumer sentiment has a direct and palpable effect on the value of a Volkswagen franchise dealership and the value of the inventory of Volkswagen cars on any dealer's lot. Consumers used to brag about their VW cars and send their friends and family into the dealerships to buy additional cars. Now they just want to hide. Dealers are left holding the bag with tens of thousands of unsalable CleanDiesel cars, and hundreds of thousands of other Volkswagen vehicles, all of which will be harder to sell and will not command the prices they would have absent the disclosure of Volkswagen's outrageous emissions fraud.

154.    Nor has VW offered a solution. Six months after this scandal erupted, there is no relief in sight. Volkswagen has stated that unidentified fixes are in development.[66] Volkswagen representatives have told lawmakers and the media that any remedy will take significant time. Mr. Horn told the congressional committee on October 8 that fixing the affected vehicles "will take years and require approval from regulators."[67] While a small number of vehicles will get by with a software fix, according to Mr. Horn, most affected cars will "require more extensive

---

[66] The Associated Press, *VW May Compensate Owners of Diesel Cars for Loss of Value*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/aponline/2015/10/08/us/ap-us-volkswagen-consumers.html. *See also* Angelo Young, *Volkswagen Diesel Scandal: Most Recalled Cars Will Require Work To Exhaust Systems, Not Just Software*, International Business Times (Oct. 8, 2015). http://www.ibtimes.com/volkswagen-diesel-scandal-most-recalled-cars-will-require-work-exhaust-systems-not-2132764 ("The necessary hardware fix . . . has yet to be worked out at the company's Wolfsburg, Germany, headquarters . . . .").

[67] Reuters, *House Slams Regulators for Not Catching VW for Years*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/reuters/2015/10/09/business/09reuters-volkswagen-emissions.html. *See also VW's U.S. chief tells Congress: no timetable to fix diesel cars*, The Dallas Morning News (Oct. 9, 2015), http://www.dallasnews.com/business/headlines/20151008-vws-u.s.-chief-tells-congress-no-timetable-to-fix-diesel-cars.ece ("Hundreds of thousands of owners of Volkswagen diesel cars that skirt emissions standards may have to wait a year or more to get their cars fixed, the head of the automaker's U.S. unit said at a contentious House hearing Thursday.").

changes including possible installation of urea tanks that neutralize harmful emissions and particulates,'[68] which will not even get started until next year at the earliest and could take up to two years to complete.[69]  Because this is a worldwide problem, with over 550,000 Affected Vehicles in the U.S. alone,[70] two years seems optimistic.

155.    Volkswagen has rejected suggestions that it provide loaner vehicles and has announced no plans to buy back the vehicles.[71]  Thus, consumers presently have no option that any reasonable person would consider satisfactory.  Drivers of affected cars are presented with a Hobson's choice:  sideline their cars (which most people cannot possibly do) or emit up to 40 times the legal limits for oxides of nitrogen.  Consumers are justifiably unhappy about the untenable position they have been forced into by VW.  For Plaintiffs and the Franchise Dealer Class there has similarly been limited and ineffective assistance from VW.  Sales are plummeting, losses escalating, customers are afraid to bring their cars in for routine servicing for fear that a change will be made to the cars rendering them less fuel-efficient and/or less powerful.

156.    Again, the sentiment of consumers has a direct effect on the bottom line of Plaintiffs and the Franchise Dealer Class.  When consumers feel betrayed by Volkswagen, there is little they can do to Volkswagen directly, but there is much at stake for the dealerships.  Customer visits have sharply decreased, sales premiums have vanished, profits have eroded; plus dealers are saddled with massive inventory carrying costs for vehicles that they cannot sell, and

---

[68] Reuters, *House Slams Regulators*, *supra* note 67.

[69] Danielle Ivory and Keith Bradsher, *Regulators Investigating 2nd VW Computer Program on Emissions*, N.Y. Times (Oct. 8, 2015), http://www.nytimes.com/2015/10/09/business/ international/vw-diesel-emissions-scandal-congressional-hearing.html.

[70] *Id.*

[71] Young, *supra* note 66; Ivory and Bradsher, *supra* note 69.

they cannot repurpose their working capital toward vehicles that are salable. Moreover, franchise dealers no longer have offerings from Volkswagen (with whom Franchise Dealer Class members have exclusive sales agreements) to compete with other brands in the high-mileage efficient car space, and thus are losing sales to VW competitors.

## K.     Things at Volkswagen Will Not Get Better Anytime Soon

157.     VW released a stop-sale order instructing dealers to immediately stop selling the Affected Vehicles.[72]  VW has also withdrawn its application to the EPA for approval to sell its model year 2016 diesel vehicles, leaving them quarantined in ports until it resolves the presence of auxiliary emissions control devices to the satisfaction of the EPA.[73]  There is no way for Plaintiffs and other franchise dealers to replace the lost inventory with gas-powered models and these actions, of course, have caused serious and long-lasting financial harm to Plaintiffs and the members of the Franchise Dealer Class.

158.     Experts now point to the "uniquely awful" corporate governance at VW as a major factor in the fraudulent scheme.[74]  VW's "peculiar corporate culture" and "lax boardroom controls," combined with highly centralized decision-making and a culture that encouraged the concealment of problems, greatly increased the risk of corporate fraud and abuse.[75]  Alexander Juschus, director of German proxy advisor IVOX, noted that "[t]here have been warnings about

---

[72]     http://www.detroitnews.com/story/business/autos/foreign/2015/09/19/vw-us-dealers-halt-sales-diesel-cars/72488232/ (last visited on Oct. 16, 2015).

[73]     http://bigstory.ap.org/urn:publicid:ap.org:5c7a66fe0bd448f999b2c59379622488 (last visited on Oct. 16, 2015).

[74]     http://www.cnbc.com/2015/10/04/volkswagens-uniquely-awful-governance-at-fault-in-emissions-scandal.html (last visited on Oct. 16, 2015).

[75]     *Id.*

VW's corporate governance for years [including prostitution and bribery scandals in 2006], but they didn't take it to heart and now you see the result."[76]

159.    To remedy its violations, Volkswagen says that it intends to recall the Affected Vehicles and configure them to settings that produce a clean level of soot and $NO_X$.  In reconfiguring to this new setting, the efficiency, power, and performance of the Affected Vehicles will decline dramatically.  Further, there will be serious degradation of vehicle durability, as these vehicles are designed to operate under particular settings.  Certain parameters such as exhaust gas temperature, oil life, or engine/turbocharger RPMs will change and result in decreased durability as Volkswagen attempts to undo the effects of the fraud.  The new VWAG CEO, Matthias Mueller, has stated that VW expects the recall of Affected Vehicles to begin in January 2016, and that the recall process will take up to a year to complete.[77]  As of the filing of this Complaint, in April, 2016, the recall process has not begun—a viable fix has yet to be identified or approved by CARB and the EPA.

160.    As speculated by Karl Brauer, senior analyst for Kelley Blue Book: "'It's really unknown, but I think there'll be an extended period of reduced value for [used VW vehicles]. The resolution will probably not leave as big of an impression and won't counteract the initial impression that [consumers] are getting with these diesel cars.'"[78]  Of course, reduced values for the Affected Vehicles will directly impact profits for Plaintiffs and the Franchise Dealer Class, which are the primary market for used and certified used VW cars.

---

[76]    *Id.*

[77]    *See* http://www.bbc.com/news/business-34455328 (last visited on Oct. 16, 2015).

[78]    http://www.cnbc.com/2015/09/24/as-volkswagen-loses-other-automakers-could-benefit.html (last visited on Sept. 28, 2015).

**L.      Volkswagen's Illegal Scheme Has Triggered Global Scrutiny**

161.      According to media reports, the Department of Justice ("DOJ") has launched a criminal investigation into Volkswagen over the emissions cheating scandal.[79]  Additionally, the U.S. Senate has investigated Volkswagen's dealings with the IRS in obtaining green energy tax credits,[80] the U.S. Congress's Energy and Commerce committee has called upon Horn to testify to his knowledge of the scheme,[81] 45 state attorneys general have initiated investigations,[82] and the Federal Trade Commission has opened an investigation into Volkswagen's fraudulent advertising.[83]  As opined by National Highway Traffic Safety Administration Administrator Mark Rosekind, because of Volkswagen's fraud, "'[w]e're questioning everything now.'"[84]

162.      The German government is also reportedly investigating Defendant Winterkorn for criminal fraud, while several other countries in Europe and Asia are likewise investigating both Winterkorn and VW.[85]  After becoming CEO of VWAG, Winterkorn personally appointed

---

[79]     http://www.wsj.com/articles/u-s-justice-department-conducts-criminal-probe-of-volkswagen-sources-say-1442869059 (last visited on Oct. 16, 2015).

[80]     http://www.forbes.com/sites/kellyphillipserb/2015/10/07/senate-investigates-volkswagen-dealings-with-irs-on-tax-credits/ (last visited on Oct. 16, 2015).

[81]     http://www.cnbc.com/2015/10/08/vw-us-ceo-i-had-no-knowledge-in-2014-of-defeat-devices-on-vehicles.html (last visited on Oct. 16, 2015).

[82]     http://www.bloomberg.com/news/articles/2015-10-08/texas-sues-volkswagen-claiming-deception-emissions-violations-ifiqscqq (last visited on Oct. 16, 2015).

[83]     http://consumerist.com/2015/10/15/federal-trade-commission-opens-probe-into-volkswagens-clean-diesel-advertising/ (last visited on Oct. 16, 2015).

[84]     http://www.detroitnews.com/story/business/autos/foreign/2015/09/22/nhtsa-head-vw-diesel-deception-another-reason-question-assumptions/72614662/ (last visited on Oct. 16, 2015).

[85]     http://www.reuters.com/article/2015/09/28/us-volkswagen-emissions-idUSKCN0RP14U20150928 (last visited on Oct. 16, 2015); http://www.bloomberg.com/news/articles/2015-09-30/diesel-scandal-undercuts-one-of-vw-s-few-strengths-in-showroom (last visited on Oct. 16, 2015).

the head engineers that were directly involved in the diesel strategy and implementation of the defeat devices.[86]

163.    As part of their investigation into Volkswagen's conduct, German prosecutors have raided VWAG's Wolfsburg headquarters.[87]

164.    On October 15, 2015, VWAG reportedly announced that "Germany's automotive regulator has rejected the company's remediation plan for diesel vehicles equipped with software designed to cheat emissions tests, and has instead instructed the automaker to initiate a recall covering about 8.5 million vehicles across the European Union."[88]

165.    Further, the scale and brazenness of the fraud prompted VW to set aside a 6.5 billion Euro fund to address affected consumers and the EPA.[89]

166.    In total, Defendants' illegal scheme deceived the public into buying over 550,000 Affected Vehicles at a total cost of billions of dollars to consumers nationwide, not even considering the cost of the harm already caused to the environment and public health, or the ongoing and immediate threat to the same.  The illegal scheme defrauded Plaintiffs and the Franchise Dealer Class into paying inflated costs for franchise dealerships and investing millions in such dealerships based on fraudulently inflated brand value.  Moreover, the defrauded consumers will vote with their feet, turning away from Volkswagen franchise dealers like Plaintiffs and the Franchise Dealer Class.

---

[86]    http://www.wsj.com/articles/vw-emissions-probe-zeroes-in-on-two-engineers-1444011602 (last visited on Oct. 16, 2015).

[87]    http://www.bbc.com/news/business-34475408 (last visited on Oct. 16, 2015).

[88]    http://www.law360.com/environmental/articles/714628?nl_pk=b1bf5f0b-4477-40d3-95dc-ea7e5b9e1e58&utm_source=newsletter&utm_medium=email&utm_campaign=environmental (last visited on Oct. 16, 2015).

[89]    http://www.bloomberg.com/news/articles/2015-09-22/volkswagen-ceo-s-history-of-sweating-the-details-now-haunts-him (last visited on Oct. 16, 2015).

## VI. FACTUAL ALLEGATIONS CONCERNING PLAINTIFFS

**A.     Acquisition of Plaintiffs' Volkswagen Dealerships**

167.    On or about February 17, 2014, Plaintiffs Napleton VW Orlando and Napleton VW Sanford, and on September 14, 2015 Plaintiff Napleton VW Orlando entered into Dealer Sales and Service Agreements with VGoA (the "Dealer Agreements").[90]

168.    The Dealer Agreements are each a "franchise agreement" as that term is defined in section 320.60(1), Florida Statutes and 815 ILCS 710/4 of the Illinois Motor Vehicle Franchise Act.  Pursuant to the Dealer Agreements, Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana operate dealerships for the sale and service of Volkswagen motor vehicles at the Florida and Illinois dealership locations.

169.    Napleton VW Urbana entered into a Dealership Acquisition Agreement with O'Brien Automotive of Urbana, LLC ("O'Brien") to purchase, among other things, O'Brien's Volkswagen dealership rights, related real estate, personal property and goodwill only because it was part of an overall transaction involving six (6) other franchises.  O'Brien required that all of the franchises be sold together as a condition of sale.

170.    Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana undertook an exhaustive and time consuming process to obtain approval from Volkswagen Group of America, Inc., to be granted the Dealer Agreements and completed their acquisition of the Volkswagen dealership rights, real estate, personal property, and goodwill and franchise rights (the "VW Dealerships").  Pursuant to the Dealer Agreements, Plaintiffs currently operate

---

[90] A true and correct copy of the Dealer Agreement for Napleton VW Orlando is attached hereto and made a part hereof as Exhibit A.  A true and correct copy of the Dealer Agreement for Napleton VW Sanford is attached hereto and made a part hereof as Exhibit B.  A true and correct copy of the Dealer Agreement for Napleton VW Urbana is attached hereto and made a part hereof as Exhibit C.

the VW Dealerships for the sale and service of Volkswagen motor vehicles, parts and accessories.

171.    VGoA represents to its dealers that its "stands for reputable and honest business dealings in the course of everyday business which comply with relevant rules and regulations." VGoA characterizes its collaboration with its dealers, such as Plaintiffs, as exemplifying integrity, fairness, transparency, and partnership.  However, as set forth more fully herein, the practices of the Defendants are the polemic opposite of these stated principals. Rather than adhering to their espoused principles, VW and VGoA engaged in a pattern of fraud and deception as set forth more fully below.

172.    VWAG's, VGoA's, and VCI's actions have been willful and wanton.  Upon Plaintiff's knowledge VWAG, VGoA, VCI and the Bosch Defendants have utilized the mail or wires to engage in the fraudulent conduct and racketeering activities set forth below.

173.    At all times material hereto, Plaintiffs have acted in substantial compliance with all material terms of the Dealer Agreements.

174.    The purchase by Plaintiffs of its Volkswagen franchises all occurred prior to when VW's fraudulent acts were made public, and before Plaintiffs learned of same.  There can be no doubt but that VWAG and VGoA were aware of the massive deception that was being foisted on the American public and its Volkswagen dealers when Plaintiffs acquired their Volkswagen franchises.  Perhaps most jarring was the acquisition by Napleton VW Urbana of the Volkswagen franchise and the adulterated inventory which went with it, which proceeded approximately fifty-eight (58) hours before the issuance of the NOV exposing the massive Dieselgate fraud.  Notwithstanding that the scandal that was about to break, VWAG and VGoA proceeded with the acquisition by Napleton VW Urbana in a completely "business as usual"

fashion. Neither VWAG or VGoA gave Napleton VW Urbana any indication of the impending tsunami of bad publicity, public fallout and inventory expense resulting from the inability to sell the diesel vehicles.

175. In the case of Napleton VW Urbana—and other dealerships similarly situated— the negative impact was magnified because that particular Volkswagen franchise is part of an auto mall of with other franchises (Hyundai, Kia, Mazda, Mitsubishi and Toyota/Scion). The fixed expenses of Napleton VW Urbana's operations are shared at the auto mall. As such, Napleton VW Urbana does not simply generate income, but provides incremental gross income of approximately $800,000.00 per year to the overall net profit of the combined operations at the auto mall. Thus, the price that was paid for the auto mall would have been reduced greatly had VGoA disclosed the impending tsunami of bad publicity and the destruction of goodwill that has accompanied the CleanDeisel scandal.

176. The price paid by Napleton VW Orlando, Napleton VW Sanford and Napleton VW Urbana for goodwill and franchise/going concern value of the franchised Volkswagen dealerships at the Florida Locations and Illinois Location was based, among other things, upon the reputation of VWAG and VGoA for producing-high quality, safe, and compliant motor vehicles, parts, and accessories.

177. As a direct result of VWAG's and VGoA's willful and wanton violations of applicable law, the goodwill and franchise/going concern value of all of Plaintiffs has been devalued and gross profits have plummeted. Moreover, Plaintiffs have and will continue to suffer additional expenses resulting from the continuing cost to finance their existing inventory of CleanDiesel Vehicles which are ineligible for sale by virtue of the Defeat Device and Volkswagen's apparent inability to construct a viable "fix."

178.     VGoA, being aware of the catastrophic effect that its conduct was going to have on its dealers, made a furtive attempt to buy the peace by offering to exchange "commitments" with the Volkswagen dealership community through a "Transaction Assistance Agreement" (hereinafter referred to as "TAA"), which included Plaintiffs.  The TAA would seem like an attractive offer.  Indeed, the TAA would provide Plaintiffs credits with a minimum cumulative value of $240,000.  In exchange for Plaintiffs' participation in the TAA, VGoA was to receive a release which is almost unlimited in scope and excludes only the following claims, to wit:

> (T)his release shall not be effective to relieve VWoA of any
> obligation to … (Plaintiffs) … by reason of, or any liability arising
> out of (a) any warranty obligations, (b) any sales incentive
> program current as of the Effective Date… (of the TAA) … or (c)
> any product liability claim alleging a defect in a vehicle
> manufactured or distributed by VWoA.

179.     The insidious nature of this language cannot be overstated for Volkswagen's vehicles are not "defective" in the classic sense.  In fact, the gravamen of the claims against Volkswagen as they relate to the CleanDeisel is that they operate exactly as they were designed.  They were designed to cheat.  Rather than a product defect, it is the affirmative fraud committed by Volkswagen which Plaintiffs may unwittingly been released had they accepted this offer of "assistance" from VW.  This, of course, was all done without ever disclosing the existence of the diesel emissions scheme and/or its fraudulent conduct to conceal its actions.  Plaintiffs declined to enter into any agreement with VWAG and/or VGoA which may have been intended by VW to result in a waiver of rights.  Instead, Plaintiffs notified VW and VGoA that they intend to seek all available remedies through legal recourse.

**B.      Volkswagen's Tier Pricing and Manipulation of DSI Sales Metric**

180.      At all times pertinent hereto, VGoA has advised its dealers that its metrics to determine performance and allocation are applied uniformly, fairly, without bias and in-good faith.  As is set forth more fully herein, this is simply not true.

181.      Each of VGoA's dealers are assigned to Primary Area of Influence ("PAI"). VGoA uses a metric that it refers to as Dealer Sales Index ("DSI") to measure its dealer's sales performance.  DSI is supposed to measure of the dealer's sales penetration in the PAI to which the dealer has been assigned or, in other words, the dealer's sales effectiveness.  Because a dealer is held responsible for selling into or "penetrating" the entire PAI, the size of the PAI has a direct effect on a dealer's DSI percentage. In other words, the larger the PAI (thus the greater sales responsibility to which the dealer is held) the lower the sales effectiveness score the dealer will generally have.

182.      The size and geographic composition of the PAI assigned to the dealer also impacts incentives and discounts for which dealers can qualify. The sales objectives assigned to each dealer are assigned based, in part, on a sales expectancy for each dealer. That sales expectancy is based upon the number of vehicles competitive to VGoA products that are registered within the PAI. Thus, the greater the PAI, the greater the sales expectancy and sales objective for the dealer.

183.      Those dealers who do not achieve the sales objectives assigned by VGoA, do not qualify for the same incentive/discount money received by those VGoA dealers who do reach the VGoA assigned objectives. Those dealers achieving the assigned objective numbers are charged a lower effective price for the vehicles that they purchase from VGoA, making them more competitive and able to achieve sales levels that result in benefits, incentives and increased allocations of vehicles based on inventory turnover.

184.    When Napleton VW Orlando and Napleton VW Sanford, entered into the Dealer Agreements with VGoA in 2013, there were three dealers in the Central Florida Market area. Plaintiffs and David Maus VW North and David Maus VW South (hereinafter collectively referred to as "Maus VW") were split into four PAI's with each of the dealers being assigned to one PAI for each of its dealership locations.  Leesburg Volkswagen ("Leesburg VW") had an adjoining PAI.

185.    Maus VW has two stores in the general proximity of the Clermont area, each being approximately 24 miles away.  Napleton VW Orlando and Napleton VW Sanford locations are both an additional ten miles and 14 miles further distant from the Clermont area than Maus VW and Leesburg VW, respectively.

186.    When a new location for the establishment of a dealership a test market study is conducted a new market area (in this instance a PAI) must be created for that location.  In this instance a test market study was conducted for the establishment of a new dealership location in Clermont, Florida (hereinafter referred to as "Clermont Open Point").  In order to accommodate the Clermont Open Point, a new PAI was created for that location (hereinafter referred to as the "Clermont Pai").

187.    Due to the fact that both Maus VW and Leesburg VW are significantly closer to the Clermont Open Point than are either Napleton VW Orlando or Napleton VW Sanford, the creation of the Clermont Pai has disproportionately shrunken the PAIs for both Maus VW and Leesberg VW.  Thus, Maus VW and Leesburg VW are being measured with reduced PAIs and performance-based discounts and allocations are more readily available to them than to Napleton VW Orlando and Napleton VW Sanford.

188. Maus VW and Leesburg VW are being enabled to operate on an unlevel playing field, getting preferential allocations and more desirable vehicle inventory due to the fact that they are more easily able to achieve their performance objectives. As a result Napleton VW Orlando and Napleton VW Sanford have been, and will be otherwise be forced in the future, to compete for the sale of Volkswagen motor vehicles with competitors who receive greater discounts, benefit from lower vehicle acquisition costs and get preferential allocations without selling substantially more vehicles. To make matters worse, Volkswagen has purposefully played favorites as between its dealers, distributing advertising (co-op) monies disproportionately and irrationally to favored dealers only.

189. As a result of this wrongful manipulation of the DSI Sales Metric Plaintiffs, Napleton VW Orlando and Napleton VW Sanford have and will continue to both lose sales and see their margins reduced.

190. Napleton VW Orlando and Napleton VW Sanford are not seeking to assert statutory rights to protest the establishment of the Clermont Open Point, but rather, assert that VGoA's scheme to establish multiple tiered pricing is independently actionable.

**C.    Volkswagen's Tier Pricing and Coercion to Force Franchise Dealers to Floor Plan Finance with VCI**

191. VCI is a wholly owned subsidiary of VGoA who offers inventory financing or "Floor Plan Financing") for Volkswagen dealers. VCI also offers consumer financing ("Consumer Financing") to its dealers' customers, whether or not they Floor Plan Finance with VCI. However, as set forth more fully herein, Plaintiffs and other Volkswagen dealers who do not Floor Plan Finance with VCI are placed at a distinct competitive disadvantage with their competitors who do.

- 69 -

192.    No Volkswagen dealer should have to worry that its business operations are going to be affected by the incestuous relationship which exists between VGoA and VCI. VCI is wholly owned by VGoA and is a major profit center for VGoA. However, VGoA and VCI offer Volkswagen dealers direct floor plan financing discounts ("Floor Plan Discounts") as well as discounts associated with VCI Consumer Financing ("Consumer Financing Discounts") which are either unavailable or available to a lesser extent to those Volkswagen dealers, such as Plaintiffs, who do not utilize VCI for their financing. These corrupt practices have enabled VCI to generate upwards of fourteen percent (14%) of VW and VGoA's reported income and become an integral part of VW's and VGoA's worldwide operations.

193.    An example of VW's corrupt practices is found in the Transaction Assistance Agreements ("TAA") VW offered to dealers shortly before the Dieselgate scandal broke. VGoA made a direct offer to provide two years' worth of free VCI floorplan financing which, Plaintiffs estimate, (based floorplan financing of $5,500,000) would have been saved Plaintiffs $330,000 in floorplan financing costs. But accepting that offer may have eliminated Plaintiffs ability to seek redress for any of Volkswagen's abusive and fraudulent behavior, as described herein.

194.    VGoA and VCI use direct Floor Plan Discounts to funnel money to its Volkswagen dealers who Floor Plan Finance with VCI lowering acquisition costs and establishing a punitive system of multiple-tiered pricing which penalizes dealers who refuse to Floor Plan Finance with VCI. This pattern of behavior is motivated wholly by greed and is ingrained with VGoA and VCI who have, most recently been canvassing Volkswagen dealers with offers for interest free loans and direct parts subsidies, to try to entice them to jump ship with their established lending institutions and Floor Plan Finance with VCI.

195.    Multiple-tiered pricing has also been created through the use of "dealer reserve coupons" ("Coupons") from VCI which are to be submitted along with VCI contracts for Consumer Financing and result in a Consumer Finance Discount to the dealer with every Coupon submitted.  VCI does not directly distribute Coupons.  Rather, this is done by VGoA which doles out Coupons in far greater numbers to those dealers who do their Floor Plan Financing with VCI than those, like Plaintiffs, who do not. Coupons were, in fact, offered to Napleton VW Orlando and Napleton VW Sanford but this offer came with the admonition that more would be forthcoming if they Floor Plan Financed with VCI. VCI has also made it known that dealers who do their Floor Plan Financing with VCI also receive the benefit that VCI will "buy-deeper" in the consumer market making it easier for them to finance less credit worthy customers and to write a greater number of deals.

196.    Just as is the case where VGoA has manipulated the DSI sales metric to the competitive disadvantage of Plaintiffs, VGoA's actions in persisting to attempt to engage in extortionate conduct to force Plaintiffs to use VCI for their Floor Plan Financing has and will continue to result in lower acquisition costs to Plaintiffs competitors thereby reducing sales and profit margins.

197.    As early as 2007, VGoA vowed to reach annual sales of 800,000 units, tripling its sales volume at the time.  VGoA has continued to tout artificially inflated sales goals which, even before the CleanDeisel scandal, would have required Volkswagen to increase its sales by 100,000 each year for the next four years, "a monumental task in the hypercompetitive U.S. Market."[91] Indeed, prior to the acquisition of Napleton VW Orlando and Napleton VW Sanford, Volkswagen was promoting its plans to freshen its brand with huge research and development

---

[91] http://www.autonews.com/article/20150126/RETAIL01/301269949/how-vw-veered--off-target (last visited April 4, 2016).

spending. Of course, none of this came to fruition and Volkswagen announced in November, 2015 that it was cutting 1.1 billion euros from its 2016 budget, which includes research and development.[92]

198.    Regarding its product line, VW and VGoA purposely and fraudulently induced its dealers to continue to invest in their dealership facilities and to otherwise benefit VW and VGoA. Indeed, VW and VGoA, while touting its sales goals and its plans to develop strategies that would enable it to be competitive in the market, have purposely and intentionally ignored vagaries of the retail market choosing to sell stratospherically priced niche products and being badly outsold by its competitors.

199.    Volkswagen has mismanaged supplies and allocations and Volkswagen's brand chief, Herbert Diess, has, in a complete turnaround, expressed skepticism that Volkswagen could compete viably in the U.S. with mass volume brands such as Honda and Toyota. A decision (given the investments that Plaintiffs have made based upon Volkswagen's avowed aspirations to become a serious competitor in the mass volume U.S. market) that was recently characterized as "catastrophic" by Alan Brown, head of Volkswagen's national dealer counsel.[93]

200.    Moreover, VGoA has abandoned long standing "stair-step" programs to provide financial assistance to its dealers while, all the time representing to their dealers that VGoA would replace them with new programs providing its Volkswagen dealers an equal or greater benefit than before. This egregious sham was calculated to quell poor publicity as well as dealer outrage at VGoA's conduct and was otherwise calculated to fraudulently induce its dealers and prospective dealers to continue to invest in the Volkswagen brand.

---

[92] http://www.reuters.com/article/volkswagen-emissions-idUSL8N13F2BE20151121 (last visited April 4, 2016).

[93] http://www.autonews.com/article/20160312/RETAIL/303149945/vw-dealers-demand:-stop-the-insanity (last visited April 4, 2016).

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

201.   Plaintiffs and Franchise Dealer Class members had no way of knowing about Volkswagen's deception with respect to its CleanDiesel engine system and "defeat device."  It took federal EPA and California Air Resources Board investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation on Defendants' part.  As reported by the *Los Angeles Times* on September 18, 2015, it took California Air Resources Board testing on a special dynamometer in a laboratory, open road testing using portable equipment, and the use of special testing devised by the Board to uncover Volkswagen's scheme and to detect how software on the engine's electronic control module was deceiving emissions certifications tests. Plainly, Volkswagen was intent on expressly hiding its behavior from regulators and consumers. This is the quintessential case for tolling.

202.   Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting the Company's true position with respect to the emission qualities of its vehicles.

203.   Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that information, which was discovered by Plaintiffs only shortly before this action was filed.  Nor in any event would such an investigation on the part of Plaintiffs and other

Class members have disclosed that Volkswagen valued profits over compliance with federal and state law, or the trust that Plaintiffs and other Class members had placed in its representations, or that, necessarily, Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

204. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

## B. Fraudulent Concealment Tolling

205. All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

206. Instead of disclosing its emissions scheme, or that the quality and quantity of emissions from the subject vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

## C. Estoppel

207. Volkswagen was under a continuous duty to disclose to Plaintiffs and the other Franchise Dealer Class members the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and state law.

208. Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems, and the emissions, of the vehicles at issue.

209. Volkswagen was also under a continuous duty to disclose to Plaintiffs and Franchise Dealer Class members that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state laws regulating vehicle emissions and clean air.

210. Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## VIII. CLASS ALLEGATIONS

211. Plaintiffs bring this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class:

> **The Franchise Dealer Class**
>
> All persons or entities in the United States who owned and/or operated a Volkswagen franchise dealership as of September 18, 2015.
>
> **The Florida Franchise Dealer Subclass**
>
> All persons or entities in the state of Florida who owned and/or operated a Volkswagen franchise dealership as of September 18, 2015.
>
> **The Illinois Franchise Dealer Subclass**
>
> All persons or entities in the state of Illinois who owned and/or operated a Volkswagen franchise dealership as of September 18, 2015.

212. Excluded from the Franchise Dealer Class are Volkswagen and its subsidiaries and affiliates; Bosch Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Franchise Dealer Class. Plaintiffs reserve the right to revise the Franchise Dealer Class definition based upon information learned through discovery.

213.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

214.    This action has been brought and may be properly maintained on behalf of the Franchise Dealer Class and subclasses under Federal Rule of Civil Procedure 23.

215.    <u>Numerosity</u>.  Federal Rule of Civil Procedure 23(a)(1):  The members of the Franchise Dealer Class are so numerous and geographically dispersed that individual joinder of all Franchise Dealer Class members is impracticable.  Plaintiffs are informed and believe that there are not less than 600 members of the Franchise Dealer Class, and at least 37 members of the Florida Franchise Dealer Subclass and 26 members of the Illinois Franchise Dealer Subclass. The precise number of Class and Subclass members is unknown to Plaintiffs, but may be ascertained from Volkswagen's books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

216.    <u>Commonality and Predominance</u>:  Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a)    Whether Volkswagen engaged in the conduct alleged herein;

    b)    Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

c)      Whether the CleanDiesel engine system in the Affected Vehicles contains a defect in that it does not comply with U.S. EPA requirements and federal and state emissions regulations;

d)      Whether the CleanDiesel engine systems in Affected Vehicles can be made to comply with EPA and state standards without substantially degrading the performance and/or efficiency of the Affected Vehicles;

e)      Whether Volkswagen knew about the defeat device and, if so, how long Volkswagen has known;

f)      Whether Bosch Defendants designed and manufactured a defeat device;

g)      Whether Volkswagen marketed, and distributed Affected Vehicles with a defeat device;

h)      Whether Volkswagen's conduct violates the federal Dealers' Day in Court Act;

h)      Whether Volkswagen's conduct violates RICO and other laws as asserted herein;

i)      Whether Volkswagen's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws;

j)      Whether Plaintiffs and the other Class members overpaid for their dealerships and their inventory of Affected Vehicles;

k)      Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

l)      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

010549-11  865477 V1

217.    <u>Typicality</u>:  Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Volkswagen's wrongful conduct as described above.  Moreover, all class members entered into like form dealership agreements with VGoA.

218.    <u>Adequacy</u>:  Federal Rule of Civil Procedure 23(a)(4):  Plaintiffs are adequate Class representative because their interests do not conflict with the interests of the other members of the Franchise Dealer Class and subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Franchise Dealer Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

219.    <u>Declaratory and Injunctive Relief</u>:  Federal Rule of Civil Procedure 23(b)(2): Volkswagen has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Franchise Dealer Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Franchise Dealer Class as a whole.

220.    <u>Superiority</u>:  Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  It would be impracticable for the members of the Franchise Dealer Class to individually seek redress for Volkswagen's wrongful conduct.  Even if Franchise Dealer Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties,

and provides the benefits of single adjudication, economy of scale, and comprehensive

supervision by a single court.

## IX.     VIOLATIONS ALLEGED

**A.     Claims Brought on Behalf of the Franchise Dealer Class**

### COUNT I
### VIOLATIONS OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT
### 15 U.S.C. § 1221, ET SEQ.
### (BROUGHT AGAINST VOLKSWAGEN GROUP OF AMERICA)

221.     Plaintiffs incorporate by reference all preceding allegations as though fully set

forth herein.

222.     The Federal Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221, *et seq.*,

provides a cause of action for dealers against manufacturers that fail "to act in good faith in

performing or complying with any of the terms or provisions of the franchise, or in terminating,

canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. VGoA is wholly

owned by VWAG. VGoA is an agent under the complete control of VWAG and acts in concert

with VWAG for the purpose of selling cars to Plaintiffs.

223.     Pursuant to 15 U.S.C. § 1221(e), the term "good faith" is defined as "the duty of

each party to any franchise, and all officers, employees, or agents thereof to act in a fair and

equitable manner toward each other so as to guarantee the one party freedom from coercion,

intimidation, or threats of coercion or intimidation from the other party: Provided, That

recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed

to constitute a lack of good faith."

224.     In this District, coercion and intimidation in violation of the statute are not limited

to exercise of positive force or direct threats, but may result from any pressure which puts one in

actual fear of loss of property or injury to business; unfair and inequitable conduct may be of such a nature as to constitute coercion and intimidation.

225.    As set forth above, VWAG and VGoA have purposely and knowingly defrauded Plaintiffs regarding the legality, efficacy and environmental compliance of the Affected Vehicles.

226.    VGoA has failed to act in good faith in providing adequate assurance that it will adjust its DSI market performance metric for its Volkswagen dealers to take into account proportionate reductions in Plaintiffs' areas of responsibility (PAI) resulting from its opening newly established locations.

227.    VGoA has manipulated the market and its PAI to distort its DSI sales metric specifically to the detriment of Plaintiffs, Napleton VW Orlando and Napleton VW Sanford and threaten to do so against Napelton VW Urbana.

228.    VGoA has attempted to coerce Plaintiffs to finance their inventories with VCI thereby depriving Plaintiffs of cost subsidies and favorable allocations afforded to those Volkswagen dealers who knuckle under to VGoA pressure.

229.    Volkswagen and VGoA have known of the use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

230.    Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.  Volkswagen concealed this information as well.

231.    By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices.

232.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above.  Volkswagen compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, environmentally clean, efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

233.    Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive its franchise dealers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen, Audi and Porsche brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Affected Vehicles; all causing the true value of franchise dealerships to be substantially lower than the prices paid for such franchise dealerships.

234.    Volkswagen owed Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

> a.      Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

> b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Affected Vehicles generally, and the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

235.    Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the Affected Vehicles has greatly diminished and the value of Volkswagen franchise dealerships and the value of the improved real property used for such dealerships has greatly diminished.  In light of the stigma attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be and are significantly harder to sell at any price, and may not be sold, and must be stored until such time as Volkswagen renders them legal in the United States.

236.    Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Plaintiffs and the Franchise Dealer Class.  A dealership that sells vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable dealership that sells vehicles made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

237.    The actions of VGoA and VCI clearly violate the express prohibition set forth in 15 U.S.C. § 1222.

238.    As a result of the illegal conduct of VWAG, VGoA and VCI, Plaintiffs have suffered damages including, but not limited to, lost profits, increased financing and related

- 82 -

expenses, increased inventory carrying costs, loss of sales, and the loss of value of the business as a going concern.

## COUNT II
## VIOLATIONS OF RACKETEER INFLUENCED AND
## CORRUPT ORGANIZATIONS ACT (RICO)
### VIOLATION OF 18 U.S.C. § 1962(C) - (D)

239.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

240.    Plaintiffs bring this Count on behalf of the Franchise Dealer Class and against Defendants Volkswagen AG; Volkswagen Group of America, Inc.; Robert Bosch GmbH, Inc.; and Robert Bosch, LLC (collectively, "RICO Defendants").

241.    The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

242.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

243.    For many years now, the RICO Defendants have aggressively sought to increase the sales of Affected Vehicles in an effort to bolster revenue, augment profits and increase Volkswagen's share of the diesel vehicle market.  Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy.  In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Emissions Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Affected

Vehicles were "clean" and "environmentally friendly." As explained in greater detail below, the RICO Defendants' acts in furtherance of the Emissions Fraud Enterprise violate §§ 1962(c) and (d).

> **1.** **The Members of the Emissions Fraud Enterprise**

244. Upon information and belief, the Emissions Fraud Enterprise consisted of the following entities and individuals.

> **a.** **Volkswagen Defendants**

245. The Volkswagen Defendants include Volkswagen AG, Volkswagen Group of America, and Volkswagen Credit. Although each Volkswagen Defendant is a distinct legally entity, they are all wholly-owned[94] and controlled[95] by Volkswagen AG.

246. As noted previously, in 2007, the Volkswagen Defendants made it their mission to become the dominant automotive manufacturing conglomerate in the world. At the time they articulated this goal, however, the Volkswagen Defendants were struggling to retain their foothold in the American market. Their strategy of wooing customers with premium products was not paying off and VGoA's costly plant in Chattanooga, Tennessee was "woefully underutilized."[96]

247. In response to these obstacles, Defendant Volkswagen AG and its leader at the time, Martin Winterkorn, set in motion an ambitious plan to triple the Volkswagen Defendants'

---

[94] http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Shareholdings.bin.html/binarystorageitem/file/Anteilsbesitz+VW+AG+31.12.2014_englisch.pdf

[95] http://www.volkswagenag.com/content/vwcorp/content/en/brands_and_products.html; http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf

[96] Anton Watts. VW Drama: Why Piech Wants Winterkorn Out-and What the Future May Hold. Car and Driver (Apr. 16, 2015).

sales in the United States. The linchpin of this strategy was increasing sales of "diesel-powered cars . . . [and] promising high mileage and low emissions without sacrificing performance."[97]

248.     Additionally, to achieve their lofty sales goal, the Volkswagen Defendants made a business-driven decision to move away from the selective catalytic reduction ("SCR") emission control systems they had previously used in their vehicles and that were industry standard at the time. Instead, they sought to replace the SCR systems with the less expensive and easier to maintain lean NO$_X$ trap ("LNT") systems.[98] Critically, however, the LNT technology the Volkswagen Defendants sought to implement had not been shown to effectively reduce toxic NO$_X$ emissions to lawful levels under normal operating conditions.

249.     Accordingly, working with the other members of the Emissions Fraud Enterprise, the Volkswagen Defendants devised a scheme to circumvent the United States' stringent emissions standards by incorporating a "defeat device" into their LNT emissions control system. The "defeat device" automatically increases exhaust gas recirculations and activates the LNT system during *testing conditions only*.[99] Employing this technology, Affected Vehicles routinely pass emissions tests even though in normal operating conditions they emit unlawful levels of toxic pollutants into the atmosphere, when the LNT system is disabled.[100]

---

[97] Danny Kim, Aaron Danny Hakim, Aaron Kessler, and Jack Ewing, "As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal," New York Times (Sept. 26, 2015).

[98] The term "NOx trap" refers to any device whose purpose is to reduce the oxides of nitrogen. See https://en.wikipedia.org/wiki/NOx_adsorber. However, the term here is used as a shorthand, informal reference to the emissions control system developed by the Volkswagen Defendants as an alternative to the SCR system. Unlike the NOx trap, SCR systems require vehicles to carry an onboard tank of an exhaust additive, often urea crystals in mineralized water that has to be refilled every 10,000 miles at a cost of around $300. Additionally, SCR systems also increase the vehicles' initial purchase price.

[99] Testimony of Michael Horn, President and CEO of Volkswagen Group of America, Inc. Before H. Comm. on Energy and Commerce, 114th Cong. (2015).

[100] *Id.*

250.     Making matters worse, in order to profit from the scheme and increase their sales according to plan, the Volkswagen Defendants unabashedly billed the Affected Vehicles as "*clean*" and "*environmentally friendly*" vehicles.[101]

251.     In sum, as part of their effort to become the dominant automotive manufacturing conglomerate in the world, the Volkswagen Defendants controlled and directed an eight-year-long enterprise whose purpose was to deceive regulators and the public through lies and deception.

> **b.     The Volkswagen Defendants' Executives, Officers and Engineers**

252.     Upon information and belief, the Volkswagen Defendants' leaders -- including Martin Winterkorn, Ulrich Hackenberg, Frank Tuch, and Wolfgang Hatz -- played central roles in the Emissions Fraud Enterprise's unlawful scheme.

**Martin Winterkorn**

253.     Winterkorn took the helm of Volkswagen AG in 2007 and was the chief architect of the Volkswagen Defendants' strategy to triple sales in the American market by relying more heavily on their purportedly revolutionary "clean" diesel offerings.[102]

254.     Still, Winterkorn quickly realized his strategy could not succeed if the Volkswagen Defendants relied on the same SCR technology they had used in their pre-2009 diesel vehicles and that all their competitors used on more expensive diesel offerings. Winterkorn instead advocated an alternative course of action that enabled the Volkswagen Defendants to cut costs and offer the public lower-priced diesel vehicles.  To that end, he

---

[101] See Jad Mouawad & Sydney Ember.  VW's Pitch to Americans Relied on Fun and Fantasy.  New York Times (Sept. 27, 2015), http://nytimes.com/2015/09/28/business/media/vws-pitch-to-americans-relied-on-fun-and-fantasy.html?ref=business.

[102] *Volkswagen AG, TDI: U.S. Market Success*, Clean Diesel Delivers (March, 2015), http://cleandieseldelivers.com/media/Douglas-Skorupski-VWoA_DTF_March2015.pdf.

appointed Ulrich Hackenberg and Wolfgang Hatz, two former Audi engineers and members of

the Emissions Fraud Enterprise, to lead the research and development facet of the "clean" diesel

project.

255.    Despite Hackenberg and Hatz' best efforts, the technological hurdles were too

formidable and a viable, lawful LNT-based system could not be found.  Although Winterkorn

was routinely apprised of these obvious technical setbacks, he continued to pursue the aggressive

cost-cutting, profit driven plan he had originally envisioned.  In doing so, he directly participated

in the scheme to defraud regulators and consumers.

**Ulrich Hackenberg**

256.    On February 1, 2007, Hackenberg was appointed to Volkswagen's Brand Board

of Development.  In this capacity, he was responsible for the technical development of all of the

Volkswagen Defendants' brands.[103]

257.    On July 1, 2013, Hackenberg was appointed to the Board of Management of Audi

AG and made responsible for its Technical Development department.  In this capacity,

Hackenberg spearheaded the development of Audi's TDI "CleanDiesel" engines. As he

explained in a press release, his strategy for Audi's technical development included the

following:

> [P]ushing forward with development in . . . our TDI engines in the
> USA – our clean diesel offensive is bearing substantial fruit. In
> China, too, we are already introducing the first clean diesel models
> and watching developments there very closely. We also expect a
> great deal from g-tron technology, the most sustainable type of gas
> drive.[104]

---

[103] https://www.audiusa.com/newsroom/corporate/audi-ag-board-of-management/ulrich-
hackenberg

[104] "Gentlemen Start Your Engines," http://audi-encounter.com/magazine/ technology/01-
2015/126-gentlemen-start-your-engines (2014).

- 87 -

258.    Hackenberg's statement is illustrative of the Volkswagen Defendants' efforts to falsely bill Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient" when the opposite was true.

**Frank Tuch**

259.    In 2010, Tuch was appointed head of quality control across several of the Volkswagen Defendants' brands.  Winterkorn hoped Tuch would bring the Volkswagen Defendants "forward in the USA."[105]  Volkswagen's in-house magazine reported that Tuch and Winterkorn worked closely to honor that pledge, meeting "every Monday to discuss quality issues, often taking test drives in vehicles manufactured by the company."  In his role as head of quality assurance, Tuch was also intimately familiar with Volkswagen, Audi, and Porsche engines and transmissions. Among his duties was "the development and production of components such as engines, transmissions, seats and suspension parts" for small, compact, midsize, and full size product lines, including all the Affected Vehicles.[106]

260.    Significantly, Tuch also oversaw "36 laboratory locations throughout the world in terms of training and auditing and also finds staff to fill laboratory manager positions," including the Volkswagen Defendants' laboratories in the United States, which were primarily responsible for emissions testing of the Affected Vehicles.[107]

261.    On information and belief, Tuch knew Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

---

[105] http://www.marketwatch.com/story/volkswagen-suspends-quality-control-chief-2015-10-20-84855452.

[106] Jack Ewing. "Volkswagen Suspends 5th Executive in Emissions Scandal," The New York Times (Oct. 20, 2015).

[107] http://www.volkswagen-larriere.de/en/what_we_do/corporate_divisions/quality_assurance.html.

**Wolfgang Hatz**

262. Hatz directed engine development for the Porsche, Audi and Volkswagen brands. In this role, he supervised the development of the engines and transmissions for Affected Vehicles and had knowledge of their technical details. On information and belief, Hatz knew the Affected Vehicles used defeat devices to evade federal and state vehicle emissions standards.

### c. Bosch Defendants

263. The Bosch Defendants[108] tested, manufactured and sold the electronic control module ("ECM") that managed the LNT emissions control system used by the Volkswagen Defendants in the Affected Vehicles. This particular ECM is more formally referred to as the Electronic Diesel Control Unit 17 ("EDC Unit 17").[109]

264. EDC Unit 17 could not effectively lower $NO_X$ emissions to legal levels during normal operating conditions. In order to pass the emissions test, then, EDC Unit 17 is equipped with a "defeat device," which is software that allows the vehicle to determine whether it is being operated under normal conditions or testing conditions. Under normal operating conditions, the software downgrades exhaust gas recirculations and shuts off the LNT or SCR after-treatment system thereby allowing the vehicle to perform with high power and efficiency, but also allowing many times more toxic pollutants than is allowable under law. By contrast, under testing conditions, the software ups exhaust gas recirculation and turns on the LNT or SCR after-treatment system, which reduces the $NO_X$ emissions enough to pass the emissions test with flying colors, but negatively impacts the vehicle's gas mileage and performance.[110]

---

[108] The Bosch Defendants include: Robert Bosch GmbH, Inc.; and Robert Bosch, LLC.

[109] http://www.bosch-presse.de/presseforum/details.htm?txtID=7421&tk_id=108.

[110] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

265.     On information and belief, well aware that its EDC Unit 17 could be used to cheat emissions testing, the Bosch Defendants, seeking to conceal their involvement in the unlawful Emissions Fraud Enterprise, sent a letter to Volkswagen AG in 2007 stating that Affected Vehicles *could not be lawfully operated* if the LNT or SCR after-treatment system was disabled.[111]

266.     Indeed, notwithstanding their knowledge that the Affected Vehicles *could not be lawfully operated* if the emissions system was disabled, the Bosch Defendants, driven to cement their position as a leading supplier of diesel emissions equipment, went on to sell approximately *eleven million* EDC Unit 17s to the Volkswagen Defendants over an eight year period.[112]

267.     The Bosch Defendants' decision to continue the sale of EDC Unit 17s to the Volkswagen Defendants for years on end is remarkable considering that:

a.     The Bosch Defendants manufactured, tested and sold emissions control systems to various other diesel vehicle manufacturers, *none* of which included the "defeat device" software that allowed vehicles to automatically activate or disable the emissions after-treatment system depending on operating conditions.[113]  Upon information and belief, the Bosch Defendants knew the "defeat device" was not necessary for any legitimate purpose.

b.     None of the varied emissions control systems the Bosch Defendants tested, manufactured and sold to other diesel vehicle manufacturers relied on the same technology the Volkswagen Defendants were utilizing.  Indeed, the Volkswagen

---

[111] http://jalopnik.com/feds-are-now-investigating-volkswagen-supplier-bosch-ov-1743624448.

[112] http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software.

[113] http://www.inautonews.com/vw-diesel-scandal-bosch-software-cleared-of-wrongdoings-by-epa.

Defendants' competitors, including reputable and technologically sophisticated brands like Daimler (Mercedes-Benz) and BMW, continued using exclusively the more expensive SCR technology.[114]

c.      Even for SCR systems in Volkswagen's Gen2 and Gen3 SCR-equipped engine systems, the amount of exhaust fluid the system used and was able to store was too low for normal driving conditions, suggesting that the quantity was calculated to meet just the testing time and not meant to be engaged during normal usage.

268.    Absent an extraordinary engineering breakthrough—for which there was no external evidence—the programming of the EDC Unit 17 presented a practical impossibility. The Bosch Defendants should have known or were reckless in failing to realize that the Volkswagen Defendants had *not* actually engineered revolutionary emissions control systems that enabled Affected Vehicles to maintain performance, fuel efficiency, reduce emissions *and* reduce costs.[115]

## 2.    Emissions Fraud Enterprise Allegations

269.    The persons and entities described in the preceding section are members of and constitute an "association-in-fact" enterprise.  Alternatively, the Volkswagen Defendants and their Executives, Officers and Engineers are members of and constitute a "legal" enterprise.  *See* 18 U.S.C. Section 1961(4).

---

[114] http://www.nytimes.com/2015/09/27/business/as-vw-pushed-to-be-no-1-ambitions-fueled-a-scandal.html?_r=0.

[115] Upon information and belief, sophisticated entities like the Bosch Defendants were also likely aware that Wolfgang Bernhard, a former high-level executive with Mercedes-Benz with a reputation for implementing cost-cutting measures, had been removed from the "clean diesel" project at Volkswagen AG shortly before the Volkswagen Defendants abandoned the SCR systems and inexplicably developed what was purportedly an even cheaper technology.  *See*, http://www.foxbusiness.com/features/2015/10/05/vw-emissions-probe-zeroes-in-on-two-engineers.html.

270.    The Emissions Fraud Enterprise began approximately in 2007 with Volkswagen AG's decision to produce Affected Vehicles with ineffective LNT based emissions control systems that generated unlawful levels of pollutants and purposefully cheated emissions testing. The Emissions Fraud Enterprise continued without interruption for approximately the next eight years, as the Volkswagen Defendants continued to install Bosch EDC Unit 17s in the Affected Vehicles that employed defeat devices.  The Emissions Fraud Enterprise was first disclosed in approximately September of 2015 when U.S. regulators uncovered the fraudulent scheme and exposed the RICO Defendants to the public. The Emissions Fraud Enterprise ceased shortly after the September 18, 2015, and November 2, 2015 NOVs, when the Volkswagen Defendants ceased selling or leasing the Affected Vehicles.

271.    At all relevant times, the Emissions Fraud Enterprise:  (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which the RICO Defendants engaged; and (c) was an ongoing organization with an ascertainable, and in this case decidedly hierarchical, structure.

272.    Volkswagen AG and its executives, officers and engineers directed and controlled the affairs of the Emissions Fraud Enterprise because:

a.  they made the initial decision to transition the Volkswagen Defendants away from an effective SCR emissions control system and adopt instead the ineffective LNT emissions system, controlled by the Bosch-supplied EDC Unit 17;

b.  they made the decision to conceal the existence of the "defeat devices" and the unlawfully high emissions from regulators and the public; and

c.  they exercised their considerable corporate and purchasing power to ensure that the other RICO Defendants willingly adopted the fraudulent scheme.

- 92 -

273.    The remaining RICO Defendants also played a vital role as the "body" of the Emissions Fraud Enterprise.  They participated in the fraudulent scheme by either manufacturing or installing the fraudulent emissions control systems, including EDC Unit 17 in Affected Vehicles.  They participated in the Emissions Fraud Enterprise by concealing the truth about the Affected Vehicles.  For example, it was VGoA who deliberately provided the EPA with false information in order to secure the Certificates of Conformity without which the Volkswagen Defendants would have been unable to sell vehicles in the United States; and it was VGoA that kept Plaintiffs and other franchise dealers completely in the dark about the Emissions Fraud Enterprise and the illegal nature of the Affected Vehicles.  In short, without the other RICO Defendants' willing participation, the Emissions Fraud Enterprise's scheme to defraud would have been unsuccessful.

274.    The members of the Emissions Fraud Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Affected Vehicles (including the emissions components made and sold by Bosch) as possible.  Each member of the Emissions Fraud Enterprise shared the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  The Volkswagen Defendants sold more Affected Vehicles by utilizing an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" Affected Vehicles.  The Bosch Defendants, in turn, sold more EDC Units because the Volkswagen Defendants manufactured and sold more Affected Vehicles.  The RICO Defendants achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Affected Vehicles and the ability of the

- 93 -

emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

### 3. The Predicate Acts

275. To carry out, or attempt to carry out the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Emissions Fraud Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

276. Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit writings travelling in interstate or foreign commerce. The deceptive, fraudulent and unlawful writings include, but are not limited to:

a. The Volkswagen Defendants' representations to the consumer public and the Franchise Dealer Class;[116]

b. The Volkswagen Defendants' representations to regulatory agencies;[117] and

c. The Bosch Defendants' representations to the consumer public and the Franchise Dealer Class.[118]

277. The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

---

[116] http://jalopnik.com/why-did-volkswagen-delete-all-of-its-diesel-ads-from-yo-1731691453 (discussing the Volkswagen Defendants' efforts to delete all online marketing materials after regulators exposed their fraudulent scheme).

[117] See, e.g., United States Environmental Protection Agency, Notice of Violation (Nov. 2, 2015) at http://www.epa.gov/sites/production/files/2015-11/documents/vw-nov-2015-11-02.pdf.

[118] See, e.g., http://www.bosch-presse.de/presseforum/details.htm?txtID=2603&locale=en (Bosch Defendants' press release touting the benefits of EDC Unit 17).

278.     The RICO Defendants' conduct in furtherance of this scheme was intentional.
Plaintiffs and the Franchise Dealer Class were harmed as a result of the RICO Defendants'
intentional conduct.  Plaintiffs, the Franchise Dealer Class, regulators and consumers, among
others, relied on the RICO Defendants' material misrepresentations and omissions.

279.     As described herein, the RICO Defendants engaged in a pattern of related and
continuous predicate acts for many years.  The predicate acts constituted a variety of unlawful
activities, each conducted with the common purpose of defrauding Plaintiffs and other Franchise
Dealer Class members and obtaining significant monies and revenues from them and through
them while providing Affected Vehicles worth significantly less than the invoice price paid.  The
predicate acts also had the same or similar results, participants, victims, and methods of
commission.  The predicate acts were related and not isolated events.

280.     The predicate acts all had the purpose of generating significant revenue and
profits for the RICO Defendants at the expense of Plaintiffs and the Franchise Dealer Class, and
consumers.  The predicate acts were committed or caused to be committed by the RICO
Defendants through their participation in the Emissions Fraud Enterprise and in furtherance of its
fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class
members' funds, artificially inflating the brand and dealership goodwill values, and avoiding the
expenses associated with remediating the Affected Vehicles.

281.     During the design, manufacture, testing, marketing and sale of the Affected
Vehicles, the RICO Defendants shared technical, marketing and financial information that
plainly revealed the emissions control systems in the Affected Vehicles as the ineffective, illegal
and fraudulent piece of technology they were and are.  Nevertheless, the RICO Defendants

shared and disseminated information that deliberately represented Affected Vehicles as "clean," "environmentally friendly," and "fuel efficient."

282.    By reason of and as a result of the conduct of the RICO Defendants, and in particular, its pattern of racketeering activity, Plaintiffs and the Franchise Dealer Class have been injured in their business and/or property in multiple ways, including but not limited to:

        a.  Overpayment for inventory of Affected Vehicles, in that Plaintiffs and the Franchise Dealer Class believed they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that were not legal to sell in the U.S.;

        b.  The value of the Affected Vehicles has diminished, thus reducing their sale and resale value;

        c.  Paying inventory carrying costs including transportation and storage costs for vehicles that they cannot sell and will not be able to sell for as much as intended when the vehicles were purchased;

        d.  Payment for alternative inventory;

        e.  Loss of customer goodwill and sales associated with replacement vehicles for existing customers; and

        f.  Loss of profits.

283.    The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Franchise Dealer Class, and Plaintiffs and the Franchise Dealer Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**B.      Claims Brought on Behalf of the Florida Subclass**

### COUNT III
### VIOLATIONS OF SECTION 320.64(4), FLORIDA STATUTES
### (AGAINST VGOA)

284.      Plaintiffs Napleton VW Orlando and Napleton VW Sanford ("Florida Plaintiffs")

incorporate by reference all preceding allegations as though fully set forth herein.

285.      Florida Plaintiffs bring this Count on behalf of the Florida Subclass.

286.      Section 320.64(4), Florida Statutes, provides in pertinent part as follows:

A licensee is prohibited from committing the following acts:

(4)      The applicant or licensee has indulged in any illegal act relating to his or her

business.

287.      VGoA's conspiracy with VCI to coerce Florida Plaintiffs to finance their

inventory with VCI is an illegal act within the meaning of Florida Statutes, section 320.64(4).

288.      In the course of Volkswagen's business, VGoA willfully failed to disclose and

actively concealed that the CleanDiesel Engine System was non-EPA compliant, and the use of

the "defeat device" in Affected Vehicles as described above.  Accordingly, Volkswagen and

VGoA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or

deceptive acts or practices as defined in FLA. STAT. § 501.204(1), including representing that

Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have;

representing that Affected Vehicles are of a particular standard and quality when they are not;

advertising Affected Vehicles with the intent not to sell them as advertised; and otherwise

engaging in conduct likely to deceive.

289.      VGoA's false advertising with respect to the Affected Vehicles is an illegal act

within the meaning of Florida Statutes, section 320.64(4).

290.     VGoA's use of the Defeat Device in Affected Vehicles to purposely circumvent Federal and State environmental regulations constitute illegal acts within the meaning of Florida Statutes, section 320.64(4).

291.     VGoA's violations of section 320.64(4) give rise to a cause of action by Florida Plaintiffs, individually and on behalf of the Florida Franchise Dealer Subclass under section 320.697, Florida Statutes, for treble damages, costs and reasonable attorney's fees.

292.     Volkswagen and VGoA have known of the use of the "defeat device" and the true nature of its CleanDiesel engine system for at least six years, but concealed all of that information until recently.

293.     Volkswagen was also aware that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations.  Volkswagen concealed this information as well.

294.     By failing to disclose and by actively concealing the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, by marketing its vehicles as safe, reliable, environmentally clean, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles after they were sold, Volkswagen engaged in deceptive business practices.

295.     In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the use of the "defeat device" and true cleanliness and efficiency of the CleanDiesel engine system and serious defects discussed above.  Volkswagen compounded the deception by repeatedly asserting that the Affected Vehicles were safe, reliable, environmentally clean,

efficient, and of high quality, and by claiming to be a reputable manufacturer that valued safety, environmental cleanliness and efficiency, and stood behind its vehicles once they are on the road.

296.    Volkswagen's unfair or deceptive acts or practices were likely to and did in fact deceive its franchise dealers, including Plaintiffs, about the true cleanliness and efficiency of the CleanDiesel engine system, the quality of the Volkswagen and Audi brands, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Affected Vehicles; all causing the true value of franchise dealerships to be substantially lower than the prices paid for such franchise dealerships.

297.    Volkswagen owed Florida Plaintiffs a duty to disclose the true safety, cleanliness, efficiency and reliability of the Affected Vehicles and the devaluing of environmental cleanliness and integrity at Volkswagen, because Volkswagen:

        a.    Possessed exclusive knowledge that it valued profits over environmental cleanliness, efficiency, and lawfulness, and that it was manufacturing, selling and distributing vehicles throughout the United States that did not comply with EPA regulations;

        b.    Intentionally concealed the foregoing from Plaintiffs; and/or

        c.    Made incomplete representations about the safety, cleanliness, efficiency and reliability of the Affected Vehicles generally, and the "defeat device" and true nature of the CleanDiesel engine system in particular, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

298.    Because Volkswagen fraudulently concealed the "defeat device" and the true cleanliness and performance of the CleanDiesel engine system, resulting in a raft of negative publicity once the use of the "defeat device" and true characteristics of the CleanDiesel engine system finally began to be disclosed, the value of the Affected Vehicles has greatly diminished and the value of Volkswagen franchise dealerships has greatly diminished.  In light of the stigma

- 99 -

attached to those vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be and are significantly harder to sell at any price, and may not be sold, and must be stored until such time as Volkswagen renders them legal in the United States.

299. Volkswagen's fraudulent use of the "defeat device" and its concealment of the true characteristics of the CleanDiesel engine system were material to Florida Plaintiffs and the Florida Franchise Dealer Subclass. A dealership that sells vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable dealership that sells vehicles made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

300. Florida Plaintiffs and the Florida Franchise Dealer Subclass suffered ascertainable loss caused by Volkswagen's misrepresentations and its concealment of and failure to disclose material information. Florida Franchise Dealer Subclass members who purchased their dealerships either would have paid less for their dealership or would not have purchased it at all.

301. As a direct and proximate result of Volkswagen's violations, Florida Plaintiffs and the Florida Franchise Dealer Subclass have suffered injury-in-fact and/or actual damage.

302. Florida Plaintiffs and the other Florida Franchise Dealer Class members were injured as a result of Volkswagen's conduct in that Florida Plaintiffs and the other Florida Franchise Dealer Class members overpaid for their dealerships and did not receive the benefit of their bargain, and their dealerships have suffered a diminution in value. These injuries are the direct and natural consequence of Volkswagen's misrepresentations and omissions.

303. Section 320.695, Florida Statutes, provides that Florida Plaintiffs may, in the name of the Department, apply to a Circuit Court for an injunction, notwithstanding the existence of any adequate remedy of law, restraining VGoA from violating or continuing to violate any

provision of sections 320.60-320.70, Florida Statutes, and that such injunction shall be issued without bond. Accordingly, an injunction preventing VGoA from continuing to violate section 320.64(4), Florida Statues, is appropriate

## COUNT IV
## BREACH OF CONTRACT
## (BASED ON FLORIDA LAW)

304.     Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

305.     Florida Plaintiffs bring this Count on behalf of the Florida Franchise Dealer Subclass.

306.     Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or defective design as alleged herein, caused Florida Plaintiffs and the other Florida Franchise Dealer Subclass members to purchase their dealership or renew their dealer agreements with Volkswagen. Absent those misrepresentations and omissions, Florida Plaintiffs and the other Florida Franchise Dealer Subclass members would not have purchased their dealerships, would not have purchased additional Volkswagen inventory, or would not have done so at the prices they paid, and/or would have purchased alternative vehicles that did not contain the CleanDiesel engine system and which were not marketed as including such a system. Accordingly, Florida Plaintiffs and the other Florida Franchise Dealer Subclass members overpaid for their dealerships, overpaid for inventory and did not receive the benefit of their bargain.

307.     Every franchise dealer, including Plaintiffs and the Florida Franchise Dealer Subclass members entered into written dealership agreements with Volkswagen. Volkswagen breached these agreements by marketing and selling to Florida Plaintiffs and the other Florida Franchise Dealer Subclass members defective Affected Vehicles and by misrepresenting or

- 101 -

failing to disclose the existence of the CleanDiesel engine system's defect and/or defective design, including information known to Volkswagen rendering each Affected Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

308.    As a direct and proximate result of Volkswagen's breach of contract, Florida Plaintiffs and the Florida Franchise Dealer Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**COUNT V**
**FRAUDULENT CONCEALMENT**
**(BASED ON FLORIDA LAW)**

309.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

310.    Florida Plaintiffs bring this Count on behalf of the Florida Franchise Dealer Subclass.

311.    Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their business decisions to purchase and/or maintain a Volkswagen dealership.

312.    Volkswagen further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided to each dealership, that the Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

313.    Volkswagen knew these representations were false when made.

314.     The Affected Vehicles purchased for inventory and sold by Florida Plaintiffs and Florida Franchise Dealer Class members were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective CleanDiesel engine systems, as alleged herein.

315.     Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiffs and the other Class members relied on Volkswagen's material representations that the Affected Vehicles they were purchasing for inventory and selling were safe, environmentally clean, efficient and free from defects.

316.     The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have purchased their dealerships, would not have renewed their agreements with Volkswagen, would not have purchased for inventory the Affected Vehicles, or would not have bought their dealership or Affected Vehicles at the prices they paid.

317.     The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or operating a dealership.  Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell Affected Vehicles through Plaintiffs and other Class members.

318.     Plaintiff and the other Class members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine

system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements – in purchasing and operating their dealership and purchasing Affected Vehicles for inventory.

319.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to: their lost benefit of the bargain and overpayment at the time of purchase of their dealership; and/or the diminished value of their dealership franchise and the improved real property used for the dealership.

320.    Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.  Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

**C.      Claims Brought on Behalf of the Illinois Subclass**

**COUNT VI**
**VIOLATION OF ILLINOIS MOTOR VEHICLE FRANCHISE ACT**
**815 ILCS 710/1, ET SEQ.**

321.    Plaintiff Napleton VW Urbana ("Illinois Plaintiff") incorporates by reference all preceding allegations as though fully set forth herein.

322.    This claim is brought only on behalf of Illinois Plaintiff and the Illinois Franchise Dealer Subclass.

323.    Defendants are each a "manufacturer", "distributor", "factory representative", and "distributor representative" as those terms are defined in 815 ILCS 710/2.

324.    Illinois Plaintiff and the Illinois Subclass are "Motor Vehicle Dealers" as that term is defined in 815 ILCS 710/2.

325.    The Illinois Motor Vehicle Franchise Act ("IMVFA") prohibits "unfair methods of competition and unfair and deceptive acts or practices," including the following:

"(b) …to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." 815 ILCS 710/4(b).

"(d)…(1) to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to new motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious." 815 ILCS 710/4(d)(1).

"(e)…(2) to offer to sell or lease, or to sell or lease, any new motor vehicle to any motor vehicle dealer at a lower actual price therefor than the actual price offered to any other motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price or fail to make available to any motor vehicle dealer any preferential pricing, incentive, rebate, finance rate, or low interest loan program offered to competing motor vehicle dealers in other contiguous states…" 815 ILCS 710/4(e)(2).

326.    As set forth herein, Volkswagen and VGoA participated in arbitrary, bad faith and unconscionable acts with respect to a franchise, which caused damage to Illinois Plaintiff and the Illinois Franchise Dealer Subclass and to the public, in violation of the IMVFA.

327.    As set forth herein, Volkswagen and VGoA adopted, changed, established and implemented a plan or system for the allocation and distribution of new motor vehicles to new motor vehicle dealers, including Illinois Plaintiff and the Illinois Franchise Dealer Subclass, which was and is arbitrary and capricious, in violation of the IMVFA.

328.     As set forth herein, Volkswagen and VGoA offered to sell or lease, or to sell or lease, new motor vehicles to any motor vehicle dealer at a lower actual price therefor than the actual price offered to other motor vehicle dealers for the same model vehicle similarly equipped and utilized sales promotion plans or programs which resulted in such lesser actual price and failed to make available to a motor vehicle dealer preferential pricing, incentive, rebate, finance rate, and low interest loan programs offered to competing motor vehicle dealers in other contiguous states, in violation of the IMVFA.

329.     The IMVFA also provides that: "A manufacturer shall not require, directly or indirectly, a motor vehicle dealer to contract with a motor vehicle financing affiliate in order to receive its motor vehicles nor shall a manufacturer prevent, directly or indirectly, a motor vehicle dealer from contracting with a motor vehicle financing affiliate in order to receive its motor vehicles." 815 ILCS 710/3.1.

330.     Volkswagen and VGoA have violated 815 ILCS 710/3.1 by linking lowered vehicle pricing and incentives to use of VCI for floor plan financing and discounting.

331.     Volkswagen and VGoA's actions have been willful and wanton, thus supporting Illinois Plaintiff's and the Illinois Franchise Dealer Subclass members' claims for treble damages under 815 ILCS 710/13.

332.     Pursuant to 815 ILCS 710/13, Illinois Plaintiff and the Illinois Franchise Dealer Subclass are entitled to an injunction restraining Volkswagen and VGoA from continuing to engage in acts in violation of the IMVFA.

## COUNT VII
## FRAUD BY CONCEALMENT
## (BASED ON ILLINOIS LAW)

333.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

010549-11  865477 V1

334.     Volkswagen intentionally concealed that the CleanDiesel engine systems were not EPA-compliant and used a "defeat device," or acted with reckless disregard for the truth, and denied Plaintiffs and the other Class members information that is highly relevant to their business decisions to purchase and/or maintain a Volkswagen dealership.

335.     Volkswagen further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided to each dealership, that the Affected Vehicles it was selling were new, had no significant defects, complied with EPA regulations and would perform and operate properly when driven in normal usage.

336.     Volkswagen knew these representations were false when made.

337.     The Affected Vehicles purchased for inventory and sold by Illinois Plaintiff and Illinois Franchise Dealer Class members were, in fact, defective, non-EPA-compliant, unsafe, and unreliable because the Affected Vehicles contained faulty and defective CleanDiesel engine systems, as alleged herein.

338.     Volkswagen had a duty to disclose that these Affected Vehicles were defective, unsafe, non-EPA compliant and unreliable in that certain crucial emissions functions of the Affected Vehicles would be rendered inoperative due to the "defeat device" installed in the defective CleanDiesel engine system, because Plaintiffs and the other Class members relied on Volkswagen's material representations that the Affected Vehicles they were purchasing for inventory and selling were safe, environmentally clean, efficient and free from defects.

339.     The aforementioned concealment was material because if it had been disclosed, Plaintiffs and the other Class members would not have purchased their dealerships, would not have renewed their agreements with Volkswagen, would not have purchased for inventory the

Affected Vehicles, or would not have bought their dealership or Affected Vehicles at the prices they paid.

340.    The aforementioned representations were material because they were facts that would typically be relied on by a person purchasing or operating a dealership.  Volkswagen knew or recklessly disregarded that its representations were false because it knew that it had to use the "defeat device" in order for Affected Vehicles to pass EPA emissions requirements. Volkswagen intentionally made the false statements in order to sell Affected Vehicles through Plaintiffs and other Class members.

341.    Plaintiff and the other Class members relied on Volkswagen's reputation – along with Volkswagen's failure to disclose the faulty and defective nature of the CleanDiesel engine system and Volkswagen's affirmative assurance that its Affected Vehicles were safe and reliable, and other similar false statements – in purchasing and operating their dealership and purchasing Affected Vehicles for inventory.

342.    As a result of their reliance, Plaintiff and the other Class members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase of their dealership and/or the diminished value of their dealership.

343.    Volkswagen's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiffs and the other Class members.  Plaintiffs and the other Class members are therefore entitled to an award of punitive damages.

## COUNT VIII
## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

344.     Plaintiff incorporates by reference all preceding allegations as though fully set

forth herein.

345.     Illinois Plaintiff brings this Count on behalf of the Illinois Franchise Dealer

Subclass.

346.     Volkswagen's misrepresentations and omissions alleged herein, including

Volkswagen's failure to disclose the existence of the CleanDiesel engine system's defect and/or

defective design as alleged herein, caused Illinois Plaintiff and the other Illinois Franchise Dealer

Subclass members to purchase their dealership or renew their dealer agreements with

Volkswagen.  Absent those misrepresentations and omissions, Illinois Plaintiff and the other

Illinois Franchise Dealer Subclass members would not have purchased their dealerships, would

not have purchased additional Volkswagen inventory, or would not have done so at the prices

they paid, and/or would have purchased alternative vehicles that did not contain the CleanDiesel

engine system and which were not marketed as including such a system.  Accordingly, Illinois

Plaintiff and the other Illinois Franchise Dealer Subclass members overpaid for their dealerships,

overpaid for inventory and did not receive the benefit of their bargain.

347.     Every franchise dealer, including Illinois Plaintiff and the Illinois Franchise

Dealer Subclass members entered into written dealership agreements with Volkswagen.

Volkswagen breached these agreements by marketing and selling to Illinois Plaintiff and the

other Illinois Franchise Dealer Subclass members defective Affected Vehicles and by

misrepresenting or failing to disclose the existence of the CleanDiesel engine system's defect

and/or defective design, including information known to Volkswagen rendering each Affected

Vehicle non EPA-compliant, and thus less valuable, than vehicles not equipped with a CleanDiesel engine system.

348.    As a direct and proximate result of Volkswagen's breach of contract, Illinois Plaintiff and the Illinois Franchise Dealer Subclass have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Franchise Dealer Class and the Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.    Certification of the proposed Franchise Dealer Class and Subclasses, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as class representative plaintiffs;

B.    An order temporarily and permanently enjoining Volkswagen from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

D.    Treble damages as provided by applicable state law, and the federal statutes violated by Defendants;

E.    An order requiring Volkswagen to pay both pre- and post-judgment interest on any amounts awarded;

F.    An award of costs and attorneys' fees; and

G.    Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED:  April 6, 2016                              HAGENS BERMAN SOBOL SHAPIRO LLP


By  _/s/ Steve W. Berman_____

  Steve W. Berman (Illinois Bar No. 3126833)
  Thomas E. Loeser (*Pro Hac Vice to be filed*)
  1918 8th Avenue, Suite 3300
  Seattle, Washington  98101
  Telephone:  (206) 623-7292
  Facsimile: (206) 623-0594
  steve@hbsslaw.com
  toml@hbsslaw.com

  Elizabeth A. Fegan
  HAGENS BERMAN SOBOL SHAPIRO LLP
  455 N. Cityfront Plaza Drive, Suite 2410
  Chicago, IL 60611
  Telephone: (708) 628-4949;
  Facsimile: (708) 628-4950
  beth@hbsslaw.com

  *Attorneys for Plaintiffs and the proposed class and subclasses*